**West Chester Area School Board v. West Chester Area Education Association**

*Ross A. Unruh,* for appellant.
*Joseph W. Chupein Jr.,* for appellee.

WOOD, *J.,* February 5, 1991 — This case is presently before me for disposition of appellant School Board's petition to vacate and/or modify the award of the arbitrator, Arthur A. Sloane, entered in this matter on May 18, 1990. Oral argument was heard on January 7, 1991.

The case arose from an incident which occurred on June 8, 1989. On that date, while school was in session, Daniel Reitmeyer, a teacher at Pierce Middle School, produced a sheet of paper labeled "Jesse Jackson's White Friends Quiz" containing 40 questions and answers highly offensive and demeaning to persons of the black race. Reitmeyer proceeded to copy the quiz on a school photocopy machine, and distributed the sheets to three white colleagues that same day.

On or about August 17, 1989, in accordance with the School Code, the board met at a public hearing and unanimously decided to terminate Reitmeyer's employment on the grounds of incompetency, immorality, intemperance, cruelty, and willful violation of the school laws. The board then issued a formal decision with findings of fact and conclusions

of law which it served upon Reitmeyer on August 24, 1989. The following day, Mr. Reitmeyer elected to "grieve" his dismissal, that is, to pursue the matter through arbitration under the auspices of the American Arbitration Association as provided for in Article VI of the collective bargaining agreement between the School Board and the teacher's union.[1] Professor Arthur A. Sloane was appointed arbitrator and five days of hearing were held thereafter at the West Chester Inn.

Professor Sloane issued his decision on May 18, 1990. In it, he modified Reitmeyer's dismissal to a six-month suspension without pay. In his 17-page statement, Sloane found that Reitmeyer had committed acts of malfeasance, including a conclusion that he "blatantly violated his moral responsibilities as a teacher. . ." Sloane, however held that Reitmeyer was not fired for "just cause."[2]

The School Board appeals on the grounds that the arbitrator's decision did not comply with the es-

---

1. The pertinent parts of the contract governing discipline and dismissal read as follows:

"*Article II*"
"*Vested Board Authority*"

"2.02. The operation and management of the district and the direction of its staff are vested in the board . . . . In accordance with the Pennsylvania School Code, the board has, among other things, the rights . . . to discipline and discharge bargaining unit members for cause.

"*Article XII*"
"*Teacher's Rights*"

"12.01. No bargaining unit member shall be disciplined, reduced in rank or compensation, or deprived of any professional advantage without just cause . . .."

2. The specific finding was as follows:

"Daniel W. Reitmeyer was not dismissed for just cause. He is to be reinstated and given a six-month suspension in lieu of the dismissal, and to be made whole for wages, benefits and seniority lost in excess of these six months."

sence of the collective bargaining agreement and therefore is "manifestly unreasonable" and contrary to the law. The board contends that the arbitrator exceeded his authority by circumventing the board's standards governing the termination of professional employees, and that the decision effectuates institutionalized racism by denying students of the school district their right to equal education under the law.

It is necessary at this point to spell out some fundamental concepts governing appeals from arbitrators' decisions, particularly as regards disciplining or dismissing a public employee. The arbitrator's decision must grow out of the "essence" of the agreement. *AFSCME District Council 88 v. City of Reading,* 130 Pa. Commw. 576, 568 A.2d 1352 (1990). Most such agreements (at least those which are involved in reported court decisions) appear to have provisions authorizing discipline for "cause"; hence, while an arbitrator's finding as to whether "cause" or "just cause" exists for discipline (including dismissal) comes within the "essence" of the agreement, the selection of punishment is reserved to the employer, and an arbitrator may not, once he or she finds "cause," then substitute another punishment. *County of Centre v. Musser,* 519 Pa. 380, 548 A.2d 1194 (1988). Finally, the only grounds for dismissal are those spelled out in the Public School Code found at 24 Pa.C.S. §11-1122.[3] I

---

3. Public School Code of 1949:

"§11-1122. *Causes for termination of contract*

"The only valid causes for termination of a contract heretofore or hereafter entered into with a professional employee shall be immorality, incompetency, intemperance, cruelty, persistent negligence, mental derangement, advocation of or participating in un-American or subversive doctrines, persistent and willful violation of the school laws of this Commonwealth on the part of the professional employee. . ."

will discuss these concepts as they apply to the facts of this case.

### Did the Arbitrator Find That There Was Cause for Discipline?

To a certain extent, in answering this question, we are dealing with nice semantic distinctions. As I read his decision, the arbitrator appears to find that Reitmeyer did what he was charged with doing, that is, copy and disseminate blatantly racist and horribly offensive literature. It will serve no useful purpose for me to quote it in this opinion. The arbitrator referred to that as an act which "violated . . . moral responsibilities," but noted that Reitmeyer had a number of other good qualities, and concluded by saying that "Reitmeyer was not dismissed for just cause." He appears to acknowledge that Reitmeyer's conduct did amount to just cause for some sort of discipline, because he then proceeded to approve a six-month suspension without pay in lieu of the dismissal.

In *Manheim Central Education Association v. Manheim Central School District,* 132 Pa. Commw. 94, 572 A.2d 31 (1990), the grievant was also a teacher, who had a good record as a teacher and athletic coach for over 20 years, up until the time of the complained-of incidents. He then wrote love letters to female students and personally professed his love to one of the girls. He never had physical contact with either student. It appeared that he was going through a personal crisis in his own life at the time, and that this crisis may have precipitated the conduct described.

In that case, the arbitrator apparently did essentially what the arbitrator in this case has done. In *Manheim,* the arbitrator agreed that an act of immorality had occurred, but said that act was not sufficient cause for dismissal, and that some lesser

penalty was warranted. The Commonwealth Court observed, however, based on *Pa. Liquor Control Board v. Independent State Stores Union,* 520 Pa. 266, 553 A.2d 948 (1989), that once an arbitrator acknowledges that a grievant has committed an act which amounts to "cause" under the collective bargaining agreement, the arbitrator has no authority to, and may not, substitute his thinking as to punishment for the thinking of the School Board. It is, after all, the School Board's responsibility to discipline employees, once the employees have given grounds for such discipline. The Commonwealth Court therefore affirmed the decision of the Court of Common Pleas of Lancaster County and set aside the arbitrator's decision ameliorating the penalty of dismissal which had been imposed upon the grievant.

I cannot find any meaningful distinction between the *Manheim* case and the one presently before me. The acts complained of here were at least as immoral as the acts complained of in *Manheim* (see discussion *infra*). The whole tenor of the arbitrator's decision is that in fact those acts were committed, and that they amounted to immoral acts, and furthermore provided cause for discipline. I see no meaningful distinction between a finding that a teacher "violated his moral responsibilities" and a finding that he indulged in immorality. If he felt that nothing had been done which warranted discipline, he should not even have ordered a suspension. The arbitrator simply sought to substitute his judgment for the judgment of the School Board as to what discipline was appropriate.

### Does the Arbitrator's Decision Arise Out of the Essence of the Agreement?

It should be obvious by now from what I have said above that the answer to this question must be

"no." The agreement itself reserves to the School Board the right to discipline employees for "cause" or "just cause," depending on which paragraph one is looking at. The job of an arbitrator in a grievance procedure is to decide whether or not there is "cause." See *Independent State Stores Union.* It is not the arbitrator's job to substitute his judgment concerning appropriate discipline for that of the School Board. Since that is exactly what the arbitrator tried to do, his decision does not arise out of the "essence" of the agreement. *Philadelphia Housing Authority v. Union of Security Officers No. 1,* 500 Pa. 213, 455 A.2d 625 (1983).

### *Does Reitmeyer's Act in Copying and Disseminating the Racist "Humor" Amount to Immorality?*

Section 11-1122 of the Public School Code of 1949 supersedes the collective bargaining agreement, in that it prohibits the dismissal of a teacher on any grounds other than those enumerated in that section. In my estimation, the two sections of that statute which come closest to the conduct in question here are "immorality" and "cruelty." However, I do think it would be stretching things a bit to call what Reitmeyer has done "cruelty." After all, he did not distribute the hate jokes to any students, or even to black teachers: compare *Bovino v. Board of School Directors of Indiana Area School District,* 32 Pa. Commw. 105, 377 A.2d 1284 (1977).[4]

On the other hand, I have little hesitation in categorizing what Reitmeyer did as immoral. I have resorted to the dictionary for a definition of "immorality," and as might be expected, that definition refers me back to the definition of "moral." The

---

4. I don't mean to make light of what he did do. The problem is not that he published the material to black people, but that he harbored these sentiments and wanted to share them surreptitiously with others.

definition of "moral" is rather lengthy, and covers a lot of ground, but the substance seems to be that morality is concerned with right and wrong, and I don't imagine that anybody can disagree with that. Our Commonwealth Court, in *Everett Area School District v. Ault,* 120 Pa. Commw. 514, 548 A.2d 1341 (1988), approved the following definition: "that term has been defined as a course of conduct as [sic] offends the morals of the community and is a bad example to the youth whose ideals the teacher is supposed to foster." 120 Pa. Commw. at 517, 548 A.2d at 1342.

That definition applies to the facts of this case. The policy of the courts, and indeed, of our nation as a whole, ever since *Brown v. Board of Education of Topeka,* 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), has been that school students are entitled to be taught by teachers who treat all the races equally and without bias or prejudice. To fail to do so is immoral, in that it is wrong. The preservation and fostering of an attitude evidenced by these so-called "jokes" constitutes immorality, in my opinion.

One may also ask whether or not a single act of immorality is enough to warrant dismissal. I note that the structure of section 11-1122 of the School Code is to spell out certain things which are cause for dismissal, some of which are preceded by the word "persistent." "Immorality" is not preceded by that word. To me, "persistent" means a course of conduct indulged over a period of time. Therefore, by not using the word "persistent" as applied to the term "immorality," the legislature is suggesting that immoral acts need not be indulged in over a period of time in order to authorize dismissal. I find further support in a Commonwealth Court case involving a dismissal of a state employee for saying "I hate that goddamn Jew bastard too." *King v. Commonwealth, Unemployment Compensation*

*Board of Review,* 46 Pa. Commw. 575, 406 A.2d 1211 (1979). In that case, the Commonwealth Court noted that "the law in Pennsylvania has been perfectly clear that *unprovoked obscene and vulgar language, even in a single instance resulting in discharge,* may be the basis for a decision that a claimant is ineligible for unemployment compensation benefits. . ." 46 Pa. Commw. at 577, 406 A.2d at 1212. (emphasis supplied)

Finally, I note that the arbitrator, in language quoted earlier in this opinion, found that Reitmeyer "blatantly violated his *moral* responsibilities as a teacher." (emphasis supplied)

In short, I have no hesitation in finding that what Reitmeyer did here does in fact constitute "immorality," as that term is used in the School Code. Accordingly, I enter the following

## ORDER

And now, February 5, 1991, based on the foregoing reasoning, I set aside the decision of the arbitrator in the above matter, and reinstate the decision of the West Chester Area School Board to terminate the employment of Daniel Reitmeyer.