**Lee V. McFERREN, Petitioner**

v.

**FARRELL AREA SCHOOL DISTRICT, Respondent.**

Commonwealth Court of Pennsylvania.

Argued Oct. 13, 2009.
Decided April 8, 2010.

Barbara Seman Ochs, Sharon, for petitioner.

Andria B. Saia, Huntingdon Valley, for respondent.

BEFORE: COHN JUBELIRER, Judge, and LEAVITT, Judge, and QUIGLEY, Senior Judge.

OPINION BY Judge LEAVITT.

Lee V. McFerren petitions for review of the Secretary of Education's adjudication that affirmed the Farrell Area School District's termination of McFerren's employment as high school principal. The Secretary concluded that McFerren, who is African–American, committed an immoral act when he used the words "the white man" in the course of a disciplinary session with a high school student who was also African–American. McFerren contends that in reaching this conclusion, the Secretary misapplied the Public School Code of 1949, Act of March 10, 1949, P.L. 30, *as amended,* 24 P.S. §§ 1–101–27–2702. McFerren also contends that the Secretary erred by disregarding, without explanation, McFerren's evidence offered in defense of the District's immorality and other charges, such as, *inter alia,* negligent performance and dereliction of duty. Finally, McFerren contends that the Secretary's findings of fact concerned only trivial and everyday occurrences that do not rise to a level of misconduct serious enough to justify his dismissal. Concluding that the Secretary erred with respect to his application of the Public School Code and that his findings of fact do not support the adjudication's legal conclusions, we reverse.

### Background

The Farrell Area School District is located in Sharon, Pennsylvania, and serves a low-income, predominantly African–American student population. Because of the District's poor academic performance, the Department of Education placed the District under a corrective action order. Under this order, the Department assigned representatives, called "Distinguished Educators," to the District to offer guidance. To correct the academic and disciplinary issues at the high school, the District hired McFerren as principal under a five-year contract, with a term running from July 1, 2005, to June 30, 2010.

McFerren's mission was to institute disciplinary measures necessary to transform the chaotic environment at the high school into one conducive to learning; to raise academic standards; to improve academic performance on standardized tests; and to improve the performance of school employees, with the expectation that non-performing teachers and other employees would be dismissed.

At the conclusion of McFerren's first year, the School Board appointed McFerren "Assistant to the Superintendent" while he continued to serve as high school principal. In November 2006, District Superintendent Richard Rubano evaluated McFerren's job performance for the 2005–2006 academic year and gave him an excellent rating of 97.5 percent, *i.e.*, a score of 78 points out of a possible 80. McFerren met or exceeded expectations in all but two categories.[1] This was the only job performance evaluation McFerren ever received.

Superintendent Rubano resigned in April of 2007, at which point the School Board appointed Carole Borkowski Acting Superintendent. When it appointed Borkowski, the Board informed her that it had decided to institute termination proceedings against McFerren and directed her to gather information to support this action. In accordance with the Board's directive, Borkowski compiled what she called "anecdotal notes" about McFerren's performance, which consisted of what she observed and what others told her. Notes of Testimony, March 17, 2008, at 319–20 (N.T. __). She placed those notes in a confidential file in her office. It was not McFerren's personnel file, and McFerren was not given the opportunity to see what was in Borkowski's file or to respond. In June 2007, McFerren was stripped of his position as Assistant to the Superintendent.

On November 2, 2007, McFerren was called before Borkowski for a pre-termination *Loudermill* hearing.[2] A second *Loudermill* hearing took place on February 7, 2008, after which Borkowski suspended McFerren without pay. On March 1, 2008, the District issued formal charges against McFerren, including persistent negligence in the performance of duties; persistent and willful failure to comply with the school laws of Pennsylvania; and willful neglect of duties. At the hearing, the District amended the charges to include immorality and intemperance.

The School Board conducted hearings on these charges on five different days from March through May 2008, at which numerous witnesses testified, both on behalf of McFerren and on behalf of the District. The hearing was governed by Section 1122 of the Public School Code, which states, in relevant part, as follows:

---

1. The evaluation rated McFerren's performance in 25 categories and found McFerren needed to improve in two categories:

 I. *Professional Performance Standards*
 \* \* \*

 12. Empowers professional faculty to be active participants in the decision-making process.

 III. *Professional Responsibilities and Participation*
 \* \* \*

 6. Demonstrates professional ethics and appropriate behavior in relationship with faculty, students, parents, central office, colleagues, and other school personnel. District Exhibit 39. McFerren's contract called for an annual performance evaluation.

2. A *Loudermill* hearing is a pre-termination hearing given to a public employee that is required by due process, as established in *Cleveland Board of Education v. Loudermill*, 470 U.S. 532, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985). *See also Olson v. Borough of Avalon*, 811 A.2d 66, 70 n. 6 (Pa.Cmwlth.2002).

The only valid causes for termination of a contract heretofore or hereafter entered into with a professional employe shall be immorality; incompetency; ... intemperance; cruelty; persistent negligence in the performance of duties; willful neglect of duties; ... conviction of a felony or acceptance of a guilty plea or nolo contendere therefor; persistent and willful violation of or failure to comply with school laws of this Commonwealth (including official directives and established policy of the board of directors); on the part of the professional employe....

24 P.S. § 11–1122(a). By a vote of 7–2, the School Board found valid cause to terminate McFerren's employment, and it did so on July 14, 2008. McFerren appealed his termination to the Secretary of Education.

The Secretary conducted a *de novo* review of the School Board's record, without taking additional evidence, in accordance with Section 1131 of the Public School Code, 24 P.S. § 11–1131.[3] Oral argument was heard on September 15, 2008. The Secretary concluded, based on factual findings largely disputed by McFerren, that in the course of his employment as high school principal, McFerren: had acted immorally; had persistently failed to comply with school laws and acted with persistent negligence; had willfully neglected his duties; and had acted with intemperance

and incompetence. Accordingly, the Secretary affirmed McFerren's dismissal. A summary of the Secretary's findings on each count follows.

### Secretary's Finding on Immorality

In March 2007, McFerren disciplined Janeil Savage, a high school student who had earned a double detention. Specifically, McFerren forbade Savage from participating in an extracurricular activity, namely, a performance by his stomp group at a high school basketball game. In violation of this discipline, Savage participated in the performance, for which McFerren suspended him. Savage challenged the suspension with a grievance. During a meeting with Savage and his father, McFerren explained to Savage that he might think that the school was too strict, but the real world was even more demanding. McFerren expressed this view in these words: "you know what Janeil, the white man [is] going to kick your ass." Adjudication, Finding of Fact 16. All three present at the meeting were African–American. The Secretary concluded that McFerren's remark was *per se* immoral because of its racial content.[4]

### Secretary's Findings on Persistent and Willful Violation of School Laws and Persistent Negligent Performance of Duties

The Secretary treated the charges of persistent negligence and persistent vio-

---

**3.** It states, in relevant part, as follows:

> In case the professional employe concerned considers himself or herself aggrieved by the action of the board of school directors, an appeal ... may be taken to the Superintendent of Public Instruction at Harrisburg.
>
> \* \* \*
>
> The Superintendent of Public Instruction shall review the official transcript of the record of the hearing before the board, and may hear and consider such additional testimony as he may deem advisable to enable him to make a proper order.

24 P.S. § 11–1131. This has been interpreted to mean that the Secretary conducts a *de novo* review and makes his own findings of fact. *Belasco v. Board of Public Education of the School District of Pittsburgh*, 510 Pa. 504, 515, 510 A.2d 337, 343 (1986). As also explained in *Belasco*, the Secretary has replaced the Superintendent of Public Instruction. *Id.* at 509, 510 A.2d at 340.

**4.** The District identified McFerren's comment as the worst offense committed during his term as high school principal, and the primary justification for his dismissal.

lation of school law as one count for purposes of his findings of fact and conclusions of law. He concluded that the District proved these charges through a series of isolated incidents. The Secretary reasoned that one incident did not prove a violation of school laws or negligence, but in the aggregate they did. The relevant incidents follow.

On March 8, 2007, Superintendent Rubano called McFerren to a meeting to discuss McFerren's dispute with the girls' basketball coach that arose after McFerren disciplined a team member. In the course of this meeting, Rubano reminded McFerren that he had not attended a recent administrative meeting, to which McFerren responded, according to the Secretary, that he could do what he wanted. Rubano rejoined that he considered McFerren's statement insubordinate.

The District employed McFerren to maintain the District's website, at an annual rate of compensation of $4,000. The Secretary found that McFerren did not update the website or keep Rubano advised of problems with the website.

In a memo to McFerren of May 29, 2007, Borkowski asked McFerren to report on the number of students to be enrolled in each class for the next school year. In this memo, Borkowski stated that she had made this request of McFerren several times previously.

In May 2007, McFerren directed Lynne Powell, a District employee, to provide him with certain grant information within the hour. When Powell did not do so, McFerren attempted to discipline her, and she filed a complaint. On June 11, 2007, Borkowski sent McFerren a letter asking him to come to her office to discuss Powell's complaint. McFerren telephoned Borkowski to discuss Powell's complaint, instead of appearing in person.

McFerren took his vacation leave in July of 2007. The Secretary found that McFerren was required to obtain Borkowski's approval for vacation leave, but he did not do so.[5]

With the 2007–2008 school year, the high school instituted a new daily schedule of eight periods instead of seven. Borkowski was advised of the change, which had been developed over the course of a year, but the Board was not advised until September when McFerren gave it a written report on the schedule change. The schedule change resulted in 19 teachers without a class assignment for 30 minutes a day. Instead, these teachers helped monitor the lunch hour in the cafeteria.

Also in the 2007–2008 school year, the high school instituted new "integrated math and integrated reading classes" to improve the performance of students who had scored "basic" or "below basic" in standardized tests. The Secretary found that because the program affected teachers' schedules, the program should have been announced by June 30, 2007, but it was not. The Secretary also found that some students were placed into the program who did not belong there because their skills were at grade level or better. Finally, the Secretary found that the integration classes had been introduced without adequate preparation.

---

5. The parties disagree on whether McFerren requested approval of his leave. Borkowski sent an e-mail to several persons, including McFerren, requesting information about their summer vacation plans, "[j]ust as a point of reference." District Exhibit 26. McFerren testified that he responded to her, several times, about his vacation plans. Further, Borkowski knew where he was because she directed a Distinguished Educator to call McFerren at home to get information in July 2007. It is also uncontested that Borkowski did not disapprove or revoke his vacation.

After McFerren's first *Loudermill* hearing, Borkowski sent a letter to McFerren on November 5, 2007. She directed him to advise her office whenever he left the building during the school day; the reason for leaving; and when he expected to return. McFerren admitted that he did not always follow the directive with respect to his lunches. He had been encouraged by Rubano to leave the building for lunch and was always available by cellphone.

The Secretary found that McFerren allowed teachers to leave 30 to 45 minutes early on December 21, 2007, the last day of school before Christmas vacation, and he did not advise Borkowski.

McFerren held staff meetings at the beginning of the day, setting a late start for high school students. Parents complained. The late start caused a loss of $800 on one day because an unnecessary breakfast had been prepared for students. The Board expected staff meetings to take place at the end of the day.

The collective bargaining agreement established four extended development days for professional staff. As of December 20, 2007, McFerren had not planned the days, according to the Secretary.

During an executive session of the School Board to discuss McFerren's performance, McFerren responded to a Board member's questioning by turning his back on the Board member. When ordered by other Board members to turn around, he did so.

The Secretary concluded that these incidents, when viewed collectively, if not separately, demonstrated McFerren's persistent negligence in the performance of his job duties and his persistent and willful failure to comply with school laws.

## Secretary's Findings on Intemperance

The Secretary found four incidents of intemperance by McFerren.

At a March 2006 meeting to discuss grants that was attended by McFerren, Rubano and Powell, Rubano admonished McFerren for his conduct, telling him to sit down and be quiet at least three times. This incident pre-dated McFerren's excellent performance evaluation and did not result in a reprimand from Rubano.

On August 30, 2006, a meeting was called by Rubano to consider the reinstatement of an employee who had been suspended for being insubordinate to the assistant principal at the high school. McFerren, frustrated by the progress of the meeting, left before it concluded, slamming the door on his way out. Rubano issued a written reprimand to McFerren for his conduct at this meeting. Several months later, however, Rubano gave McFerren an excellent performance evaluation.

On November 8, 2006, McFerren shouted at a student who was late for his job of giving morning announcements. McFerren then dismissed the student from the job.

In December 2006, Annette Pawluk, a math teacher, asked McFerren to come to the computer lab. It was hot in the room, and the 75 students who were there had become unruly. The Secretary found that when McFerren entered the room he began shouting, asking why the five teachers in the room were not able to control the students.

## Secretary's Findings on Willful Neglect of Duties

In concluding that McFerren had willfully neglected his duties, the Secretary relied on three incidents used to sustain the prior charges. Those incidents included: (1) McFerren's change of the school day from seven to eight periods; (2) McFerren's introduction of new integrated math

and reading classes; and (3) McFerren's failure to keep the District website updated. To these, the Secretary added another separate incident. On July 17, 2007, the Department of Education sent the District an email complaining that course enrollment data was late. Borkowski directed several persons, including McFerren, to reply, and Borkowski submitted the report on July 30, 2007. The Secretary found that McFerren was responsible for the District's delay, and his actions in this regard were willful.

### Secretary's Findings on Incompetency

The District did not charge McFerren with incompetency. Equating insubordination with incompetency, the Secretary found four incidents to constitute incompetence: (1) McFerren turned his back on a School Board member who was speaking to him; (2) McFerren did not notify Borkowski when he left the building to go to lunch; (3) McFerren responded to Borkowski's letter to see her about Powell's complaint by telephoning instead of appearing in person; and (4) McFerren did not attend an administrative hearing and then told Rubano that he could miss such meetings.

### Issues on Appeal

■ On appeal,[6] McFerren disputes many of the Secretary's above-recited findings of fact, contending that they resulted from the Secretary's complete disregard of all testimony offered by McFerren, both his own and that of teachers and counselors at the high school who testified on his behalf. For example, the Secretary simply disregarded, without any comment, the testimony of high school counselors and teachers who attested to the value of the integrated math and reading classes that had been developed after a year long study and with the awareness of the superintendent.[7] McFerren notes that where a conflict in testimony existed, the Secretary consistently resolved the conflict in favor of the District but without making explicit credibility determinations. When the Secretary did make an express credibility determination, he did so by using a double standard. For example, the Secretary credited Borkowski's testimony that McFerren had not provided her with the next year's student count by May 29, 2007, and he rejected McFerren's testimony that he had provided that information several times before May 29th but, each time, his report was rejected. On this point, the Secretary rejected McFerren's testimony for the stated reason that it was not corroborated, but accepted Borkowski's version even though it also lacked corroboration.

McFerren does not dispute all the Secretary's factual findings. However, McFerren argues that for the most part the Secretary overstated trivial matters

---

6. This Court's review is limited to a determination of whether the findings of fact made by the Secretary are supported by substantial evidence, errors of law were committed or constitutional rights were violated. *Lauer v. Millville Area School District*, 657 A.2d 119, 120 (Pa.Cmwlth.1995). Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Mrs. Smith's Frozen Foods Company v. Workmen's Compensation Appeal Board (Clouser)*, 114 Pa.Cmwlth. 382, 539 A.2d 11, 14 (1988).

7. McFerren and his supporting witnesses conceded that some of the students did not need to be placed in the program. However, it was only a handful of such students that fell into this category; they were placed there because of scheduling difficulties. Because the programs were flexible, they allowed more advanced students to enhance their existing skills. This unrebutted evidence was simply ignored by the Secretary.

that do not meet the strict requirements for a lawful dismissal or relied on matters that were irrelevant to his performance as principal. Aggregating trivial, everyday occurrences, McFerren argues, does not turn the trivial into something serious. The Public School Code is intended to protect professional employees from a mid-term contract termination, except for extraordinary reasons that exceed dissatisfaction with the professional employee's performance. Stated otherwise, the record does not support the Secretary's conclusions.

McFerren's appeal raises three principal arguments, depending on the charge in question. With respect to the immorality charge, McFerren argues that the District failed to prove, as required before a district can dismiss a professional employee on grounds of immorality, that using the term "white man" offended the morals of the community. Second, McFerren argues that the Secretary's findings of fact on the remaining charges, even if accepted as true, do not support the conclusion that McFerren committed the kind of serious misconduct required by the Public School Code in order for a district to dismiss a principal. Third, McFerren contends that the Secretary repeatedly erred in his role as factfinder. The Secretary disregarded any evidence, even unrebutted documentary evidence, that was beneficial to McFerren.[8] The Secretary failed to make express credibility determinations and applied different credibility standards to witness testimony, depending on whether it was offered by McFerren or by the District.[9] These errors, McFerren argues, require that the Secretary be directed to make new factual findings.

### Section 1122 of The Public School Code

■ We begin with a review of Section 1122 of the Public School Code, which has established the standards applicable to McFerren's dismissal. This Court has explained that the purpose of Section 1122 is to provide "the greatest protection possible against dismissal." *Lauer v. Millville Area School District,* 657 A.2d 119, 121 (Pa.Cmwlth.1995). Stated otherwise, Section 1122 was not intended to provide a school district with an arsenal of weapons to use when it wishes to relieve itself of its contractual obligations to a professional employee. As explained in *Lauer,* to dismiss a professional employee protected by contract requires a serious reason, not "picayune and unwarranted criticisms." *Id.* at 123. In short, the grounds for dismissal listed in Section 1122 must be strictly construed in favor of the professional employee and against the school district.

With these principles in mind, we consider each of the charges against McFerren.

### Immorality Appeal

■ Immorality is not defined in the Public School Code. Our appellate courts have defined "immorality" as conduct that "offends the morals of the community and is a bad example to the youth whose ideals a teacher is supposed to foster and to elevate." *Horosko v. School District of Mt. Pleasant Township,* 335 Pa. 369, 372, 6 A.2d 866, 868 (1939). To establish immorality, the school district must prove three

---

**8.** For example, the Secretary found that McFerren's 2005–2006 job performance evaluation identified deficiencies in two categories, but ignored the fact that the overall evaluation was excellent.

**9.** The District contends that McFerren has waived some of his challenges to the Secretary's factual findings because they are not specifically recited in his petition for review. This contention is unfounded; the issues briefed by McFerren were recited in his petition for review.

elements: (1) that the alleged immoral act actually occurred; (2) that the act offends the morals of the community; and (3) that the act sets a bad example for students. *Kinniry v. Abington School District,* 673 A.2d 429, 432 (Pa.Cmwlth.1996). The moral standards of the community will not be presumed; they must be proved by substantial evidence. *Horton v. Jefferson County—Dubois Area Vocational Technical School,* 157 Pa.Cmwlth. 424, 630 A.2d 481, 483 (1993). Immoral conduct is something more serious than unprofessional conduct. *Id.* at 484.

■ Here, McFerren admitted that he made "the white man" comment, which he defended as a product of the circumstances. He explained that when he informed Savage that he would not be allowed to appear with his stomp group at the basketball game, Savage unleashed profanities. Then Savage proceeded to disobey the order, and McFerren suspended him. At a meeting with Savage and his father to discuss Savage's misconduct, McFerren explained that in the job world, Savage would be expected to follow rules and could not use profanity with his boss, as he did with his principal, or "the white man [is] going to kick your ass." N.T., May 21, 2008, at 979. McFerren testified that within the relevant African–American community, to which all persons at the meeting belonged, the phrase "the white man" means "the establishment, the people in control, the world." N.T., May 21, 2008, at 980. This testimony about the meaning of the term was not rebutted. The only District witness touching on McFerren's remark or the meeting itself was Rubano, who described the remark as "highly inflammatory." N.T., March 17, 2008, at 155. Neither Savage nor his father testified.

The Secretary rejected McFerren's defense, finding his choice of words indefensible in any circumstance. The Secretary acknowledged that the record was devoid of evidence that McFerren's comment offended the morals of the community, but he concluded that such evidence was not necessary. The Secretary explained as follows:

> In Mr. McFerren's case, the *District did not provide any evidence that his statement to Janeil Savage violated the morals of the community. However, I find that such a statement is highly offensive, demeaning and racist,* and so egregious that its immoral nature transcends geographic or community boundaries. In addition, the conduct is a bad example to the youth whose ideals Mr. McFerren was supposed to foster and elevate. Thus, Mr. McFerren's conduct constitutes immorality.

Secretary Decision at 25 (emphasis added).

McFerren argues that the Secretary's personal opinion is not a valid substitute for evidence of whether McFerren offended the morals of the community. The only evidence on this point is McFerren's unrebutted testimony that in the relevant community references to "the white man" are commonly made and understood in the way intended by McFerren. The District rejoins that given the racist nature of McFerren's remark, it did not need to produce evidence on community morals.

■■ For crimes of moral turpitude, a school district will not be required to produce evidence of the morals of a particular community. *See, e.g., Appeal of Batrus,* 148 Pa.Super. 587, 26 A.2d 121, 124 (1942) (holding that a teacher who submitted an application to the Liquor Control Board with false information committed an act that offended the morals of the community); *Kinniry,* 673 A.2d at 433 (teacher's trafficking in counterfeit goods was a *crimen falsi* crime that is *per se* offensive to the morals of every community). However,

the commission of crime does not always relieve the school district of the burden to present evidence about the community's morals. In *Horton,* 630 A.2d at 484–485, we held that a conviction of harassment, while unprofessional, was not immoral *per se* and offensive to the morals of every community. *See also Zelno v. Lincoln Intermediate Unit No. 12 Board of Directors,* 786 A.2d 1022, 1026 n. 7 (Pa. Cmwlth.2001) (alcohol-related offenses are not *per se* immoral).

McFerren did not commit a crime, let alone a *crimen falsi* crime. However, the District contends that there is authority for treating racist comments as *per se* offensive to the community. That authority consists of an adjudication of the Secretary as well as a decision of a court of common pleas. This proffered authority does not have precedential weight, but we reject the District's reliance on these decisions simply because they are distinguishable.

In *Sullenberger v. School District of the City of Monessen,* Teacher Tenure Appeal No. 15–94, the Secretary upheld the dismissal of a white teacher who made a highly offensive and racist comment to a group of African–American students, and it was admitted by the teacher that her comment was intolerable.[10] In addition, the district's evidence showed that the comment had caused a controversy in the community. From this evidence, the Secretary made the reasonable inference that the teacher's racist comment offended the morals of the local community.

*Sullenberger* did not establish that any comment with a racial reference is *per se* offensive to the morals of every community. It established only that evidence about the morals of the community does not necessarily require direct testimony. Rather, a finding of those morals can be inferred from evidence that the conduct was admitted by the employee to be offensive and caused a controversy in the community. Here, by contrast, the record is empty of any evidence on these points.[11] There is only the Secretary's opinion.

In *West Chester Area School Board v. West Chester Area Education Association,* 9 Pa. D. & C. 4th 125 (1991), a teacher was dismissed for distributing papers at school that contained racially offensive "jokes" that were demeaning to African–Americans. The teacher grieved his dismissal to an arbitration panel. The trial court affirmed the arbitrator's decision to uphold the teacher's dismissal on grounds of immorality. The court explained:

> The policy of the courts, and indeed, of our nation as a whole, ever since *Brown v. Board of Education of Topeka,* 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), has been that school students are entitled to be taught by teachers who treat all the races equally and without bias or prejudice. To fail to do so is immoral, in that it is wrong.

*Id.* at 132.

*West Chester* is distinguishable. First, *West Chester,* involved an arbitration,

---

**10.** When she noticed that one of the students was perspiring, the teacher said:
> You know what, this is really funny ... I don't want to offend anybody because it's not meant to offend anybody, but ... my husband sweats a lot, too, and he always says to himself that he feels like a nigger at a Ku Klux Klan meeting.

Secretary Adjudication, March 27, 1995, at 2; Finding of Fact 3.

**11.** Indeed, the only person to object to the remark was Savage, who filed another grievance recounting McFerren's comment. His grievance did not express the view that Savage found the comment offensive or racist. Rather, he found it irrelevant saying, "I did not know what this had to do with my situation." District Exhibit 18.

which required the trial court to apply a deferential standard of review. Second, the conduct in *West Chester* did not involve an oral interchange between two people in the course of a high-stress situation. It involved the premeditated distribution of written materials containing offensive and racist "jokes." Third, there is no claim, nor can there be logically, that McFerren's treatment of Savage was the product of racial prejudice.

Political correctness should not be confused with morality. McFerren's choice of words was unfortunate, as much for the unnecessary anatomical reference as for the reference to race. It is human nature to say things thoughtlessly, particularly in stressful situations, that are later regretted. Context is also important in evaluating whether speech is offensive. In *Alston v. Unemployment Compensation Board of Review*, 967 A.2d 432, 433 (Pa.Cmwlth. 2009), an African–American employee was dismissed, in part, for using "the 'N' word during a conversation with another employee;" the matter was remanded on procedural grounds. McFerren argues that by pointing out the race of the speaker and the addressee, this Court acknowledged in *Alston* that the context in which racial remarks are made should be considered. Regardless of *Alston*, McFerren's point on context is a good one. Certainly, the use of the "N" word conveys a different message when spoken by African–Americans than when spoken by white people. Likewise, McFerren's comment, if made to a white student, might have touched upon morality in the way it did not in Savage's case. Finally, an immoral act generally requires premeditation, as in the commission of a *crimen falsi*, or the distribution of racist materials.

McFerren's comment meets none of these requirements. The reasonable explanation for the District's failure to present evidence that McFerren's comment offended the morals of the relevant community is that it could not do so.

The Secretary erred in holding that McFerren's use of the phrase "the white man" was *per se* immoral. It was the District's burden to present evidence of the morals of the community and evidence that McFerren's comment offended those morals,[12] and it did not do so. Accordingly, we reverse the Secretary's conclusion that McFerren committed an act of immorality.[13]

### Persistent and Willful Violation of School Laws and Persistent Negligent Performance of Duties

McFerren argues that the Secretary erred by exaggerating minor or irrelevant incidents, which he then cobbled together to find that McFerren's performance violated school laws and that he neglected his

---

**12.** Indeed, it is difficult to square the Secretary's decision here with his adjudication in *Palmer v. Wilson Area School District*, Teacher Tenure Appeal No. 5–94. In *Palmer*, the district dismissed a teacher who (1) asked a student to cash in the teacher's lottery ticket so the teacher could avoid taxes and (2) made suggestive and inappropriate comments to a fourteen-year-old female student. The Secretary overturned the district's dismissal because the district failed to produce evidence that the teacher's conduct offended the morals of the community.

**13.** The District claims that McFerren also engaged in immoral conduct because he lied under oath at his hearing. If the District believes this to be the case, it can refer the matter to criminal law enforcement authorities. However, this argument cannot be considered because, in effect, the District seeks to amend its charges long after the hearing was over.

job duties.[14] In doing so, the Secretary disregarded the fact that McFerren effected improvements at the high school, which was his primary job responsibility. The purported violations of school laws consist entirely of disregarding Board policies. However, the adjudication did not explain where or how those policies were established, and it did not explain whether the responsibility to obey those policies fell upon the high school principal or upon the District superintendent.

We begin with a discussion of precedent. The charge of willful and persistent violation of school laws and the charge of persistent negligent performance of job duties seem often to be combined in a discharge proceeding. The same act may be used to support both charges. For example, in *Horton*, 630 A.2d 481, the school district used the same evidence to charge Horton with violation of a school law and with negligent performance. The conduct consisted of two threats. In the first, Horton grabbed another professional's shirt and made a fist, threatening that "if anybody did that to his people again, he would...." *Id.* at 483. A few hours later, Horton told the head counselor that "if anyone ever did this to his people again, he would put a gun to their head and shoot them." *Id.*

Although the same conduct may sustain both charges, the first thing a district must show is persistency. In *Horton*, we explained that persistency is shown where the improper conduct is repeated in a series of separate incidents over a substantial period of time. Horton's two threats, made three hours apart, did not constitute persistency. *Id.* at 484. It was irrelevant, therefore, whether Horton's conduct was negligent or a violation of a school law.

Each charge consists of several elements, and the district must prove all elements. Persistency is one element shared by both charges. Knowledge is another common element.

For a violation of a school law to be willful, the district must show that the employee knew of the school district's policy in question and deliberately chose not to comply. In *Cowdery v. Board of Education of the School District of Philadelphia*, 110 Pa.Cmwlth. 164, 531 A.2d 1186, 1188 (1987), this Court held that a teacher's continued violation of the board's sick-leave policy was not willful because the teacher did not know of this policy. Likewise, in *Belasco v. Board of Public Education of the School District of Pittsburgh*, 510 Pa. 504, 507, 510 A.2d 337, 339 (1986), our Supreme Court held that because a teacher had not been informed that giving a student a "love tap" with a wooden paddle violated the school district policy against corporal punishment, the teacher's conduct was not a willful violation of school law.

Likewise, for negligent performance to be shown, the school district must prove that the professional employee had knowledge of the school district's performance expectations and had been warned of the consequences of failing to meet them. Warnings may take place in the course of performance evaluations. In *Harrison v. Capital Area Intermediate Unit*, 84 Pa. Cmwlth. 344, 479 A.2d 62 (1984), for example, the teacher was dismissed after being placed on probation for his serious performance issues. Those performance issues included, *inter alia*, the teacher's failure: to keep student records; to prepare lesson plans and substitute plans; to supervise his students; to follow policies of

---

**14.** In its brief, the District discusses alleged incidents on which the Secretary made no findings and refers to hearsay evidence that the Secretary specifically excluded. We do not address these alleged incidents or hearsay evidence in this opinion.

the intermediate unit; to follow the directions of his supervisors; to give notice of his absences; or to report for duty on time. This Court affirmed the teacher's dismissal for negligent performance because the teacher had been sufficiently warned of the school district's performance expectations.

For purposes of Section 1122, a "school law" may take the form of a school board policy or directive, even one that prohibits conduct not prohibited by the Public School Code. In *Harris v. Secretary of Education,* 29 Pa.Cmwlth. 625, 372 A.2d 953, 957 (1977), we held that repeated corporal punishment of students constituted a persistent violation of the board's prohibition against such punishment. It was of no moment that the Public School Code authorized corporal punishment because the school board had exercised its prerogative to ban the practice.[15]

Negligent performance does not require the existence of a clearly adopted or articulated board policy. However, the professional employee must be advised that certain conduct is unacceptable. In *Lauer,* for example, the teacher in question was specifically directed by the principal not to make belittling remarks to students after she wrote "you're hopeless" on a student's vocabulary test on which he received a 0 score. *Lauer,* 657 A.2d at 122. After several years of abiding by the directive, the teacher one day stated that she considered being addressed by one of her students as "Mrs. H." to be an insult. *Id.* "Mrs. H." was the mother of one of the students in the classroom, and the teacher's remark, heard by the entire classroom, would have been hurtful to Mrs. H.'s child. The charge of negligent performance was not sustained. The problem was not lack of knowledge, however, but lack of persistency. Notably, we also found that the remark, albeit best unsaid, did not support the "serious charge of persistent negligence." *Id.* at 123.[16]

In sum, to prove charges of willful and persistent violation of a school law and persistent negligence in performance of duties, the school district must prove (1) persistency in the form of numerous incidents of the same misconduct and (2) knowledge that the conduct in question was wrong and that its repetition could lead to discipline or discharge. For a violation of a school law, the school district must point to an adopted policy or order that was deliberately violated. For negligent performance of a duty, the district must specifically advise the employee of that duty, whether it is doing lesson plans on time or treating students with kindness. Finally, the negligent performance must be serious, not picayune. Applying these standards here, we conclude that the Dis-

15. Other cases where this Court has upheld a dismissal for persistent violation of school laws are: *Ward v. Board of Education of the School District of Philadelphia,* 91 Pa. Cmwlth. 332, 496 A.2d 1352 (1985) (persistent abuse of sick leave and failure to report absences); *Keating v. Board of School Directors of the Riverside School District,* 99 Pa.Cmwlth. 337, 513 A.2d 547 (1986) (persistent and untoward attempt by teacher to initiate a relationship with a student after being directed to cease by the administration on several occasions); *Foderaro v. The School District of Philadelphia,* 109 Pa.Cmwlth. 491, 531 A.2d 570 (1987) (school's trade coordinator repeatedly used the school's tax exempt number to make personal purchases).

16. The district also failed to show persistency because of the gap of several years between the teacher's tactless comments. The teacher had made a second comment to a student that could be construed as critical of the student's mother. The Court found that this second comment was inadequate to show persistency and, in any case, was not sufficiently serious.

trict's evidence did not prove the elements of either charge.

 First, persistency is lacking from the District's case. The essence of persistency is repetition. There can be no repetition where the acts or omissions in question are unrelated to one another; the acts in question must be the same or very similar to be persistent. In *Horton,* for example, the employee repeated threatening, even physical, conduct, and in *Lauer* the teacher repeatedly made tactless and hurtful comments to students. Here, the conduct in each incident cited by the Secretary bears little or no relationship to that in the next incident. There is no common thread between not maintaining the District's website, for example, and talking back to Rubano at a meeting to discuss discipline of a basketball player. Likewise, changing the high school schedule and allowing teachers to leave early the day before Christmas vacation, assuming each to be "misconduct," are too different in nature to show persistency.

If there is a common thread to the incidents relied upon by the Secretary, it may lie in the findings about McFerren's conduct with superiors. He talked back to Rubano at a meeting in a manner Rubano considered insubordinate and McFerren had to be told to turn around at a school board meeting to listen to the board member's denunciation of him. However, based on *Horton* and *Lauer,* we conclude that two incidents over two and a half years do not satisfy the requisite persistency standard.[17]

 Second, the District did not satisfy the knowledge element. McFerren's personnel file is absent of any warnings from his supervisor that certain standards of meeting etiquette, for example, were expected of McFerren. District Policy 424, which is attached to and incorporated into McFerren's contract, states as follows:

> *Repeated infractions* or *those of a serious nature* will be submitted, entered and maintained in the central file in the superintendent's office. However, the employee shall have the right to challenge any material to be placed in the central file.

Respondent Exhibit No. 6, Appendix B, "Employee Personnel File," Section A, Policy 424 (emphasis added). Infractions, if repeated or serious, should have been entered into McFerren's personnel file. What is more, McFerren's contract also gives him the right to respond in writing to items in his personnel file. Specifically, the contract provides:

> Employees shall have the right to submit a written commentary, within seven (7) work days, to any material placed in the file and such written comment shall be attached to the item in the file. No unsigned or improperly identified item shall be placed in the employee's file.

*Id.* at Section C, Written Commentary. Instead, Borkowski kept private "anecdotal notes" about McFerren.

The District did not prove that McFerren had knowledge that he had committed "repeated infractions" or infractions "of a serious nature." In the absence of this knowledge, the District cannot demonstrate that his conduct constituted willful violation of school law or a negligent performance of his job. Moreover, this knowledge had to be acquired by McFerren before the filing of the District's charges. Not one of the incidents cited by

---

**17.** More problematic is the fact that the District did not have a policy or performance expectation on meeting etiquette. There is no evidence that McFerren was warned that rudeness at meetings could lead to a discharge. In the absence of this knowledge, the District cannot sustain its charges.

the Secretary to support these two charges was submitted, entered or maintained in the central file in the superintendent's office.

Third, it is not clear to the Court that all the incidents in question are serious and rise above the level of the picayune. *Lauer*, 657 A.2d at 123. The failure to maintain the District website could have been serious. However, the omission in question was not removing the names of retired teachers from the website. It was not a serious concern to the District because long after McFerren's discharge, the names of the retired teachers still remained on the website. Further, McFerren's website position was a job separate from his responsibilities as principal. The District could have simply relieved him of that position as it did his position as Assistant to the Superintendent.

However, the Court declines to do a point-by-point analysis of each incident to determine whether each act cited by the Secretary was trivial or serious enough to warrant a discharge. *Lauer*, 657 A.2d at 123. What may seem trivial in significance to the Court may, in actuality, be important in an educational setting.[18] It is the school board's prerogative to establish performance expectations, and where these expectations will have wide application, such as sick leave policy, to adopt formal board policies. However, these expectations must be made known to the professional employees governed by them. Board policy and performance expecta-

tions cannot be adopted on an *ad hoc* basis, or after-the-fact, to accommodate a school board's desire to discharge an employee prior to the completion of the contract period.

We hold that the Secretary erred in holding that the District's evidence proved its charges of willful and persistent violation of a school law and persistent negligent performance of duties. The incidents lack the commonality or repetition required for persistency. Even more importantly, the District did not prove that McFerren had knowledge that what he did, or the way he did it, violated a school law or did not meet his supervisor's expectations and could cause his discharge.

### Intemperance

■ McFerren observes that the Secretary's conclusion that he should be dismissed for intemperance is based upon the findings that, reduced to their essence, show McFerren raised his voice four times over the course of two and one-half years. McFerren contends that speaking loudly does not constitute "intemperance" within the meaning of Section 1122. We agree.

The Public School Code does not define intemperance. Both parties direct the Court's attention to a regulation adopted under the Teacher Certification Law.[19] That regulation defines intemperance as follows:

> Intemperance is a loss of self-control or self-restraint, which may result from excessive conduct.

---

18. McFerren admitted that he did not always tell Borkowski when he left for lunch. He found her directive demeaning and unnecessary inasmuch as Borkowski had his cellphone number. Borkowski acknowledged that she had McFerren's cellphone number and that she never had been unable to reach him. It is not clear whether the Secretary considered that Borkowski's directive rose to the level of a performance expectation. In any case, McFerren never received a repri-

mand under District Policy 424, which strongly suggests that the "infraction" was not "of a serious nature" that could lead to dismissal.

19. The Teacher Certification Law, renamed as The Professional Educator Discipline Act, Act of December 12, 1973, P.L. 397, *as amended*, 24 P.S. §§ 2070.1a–2070.18a.

22 Pa.Code § 237.5. This Court has explained the meaning of the regulation as follows:

> Intemperance is defined in 22 Pa.Code § 237.5 as "a loss of self-control or self-restraint, which *may* result from excessive conduct." (emphasis added). Conduct that extended over a period of time, whether it is hour upon hour or day after day, may be considered excessive. Excessive is defined as "exceeding the usual, proper, or normal."

*Gow v. Department of Education,* 763 A.2d 528, 534 (Pa.Cmwlth.2000).[20]

Notably, this regulation states that it does not apply to Section 1122. *See* 22 Pa.Code § 237.2(a) (stating that "[t]his subchapter does not apply to similar or identical terms used in ... section 1122 of the Public School Code of 1949 ..."). The dictionary defines intemperance as "excess or lack of moderation in an action." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1175 (2002).[21] In *Gow,* the Court used both the dictionary and the regulation to develop its above-quoted definition of intemperance. In actuality, the dictionary and the regulation do not really differ: intemperance is a loss of self-control that is extreme, violent or severe.

Here, McFerren became upset during two meetings with adults; raised his voice with a student late for his school job; and raised his voice to bring order to an unruly computer lab.[22] This is not an abnormal loss of control. Adults express emotion at meetings with other adults, and principals "yell" at students, especially those who are unruly or fail to report to a job assignment on time.

There is only one case where appellate courts have considered intemperance, as used in Section 1122. *See Belasco,* 510 Pa. 504, 510 A.2d 337. In that case, two teachers, Powers and Belasco were dismissed from a school for disabled children for intemperance and cruelty. Powers lightly struck a student on the buttocks with a wooden paddle. The student then went to his next class, where two teacher's aides paddled the student five times. Belasco, the teacher in charge of the classroom, did not immediately intervene because of other demands from the classroom. The Secretary's decision to reverse their dismissal was affirmed by the Supreme Court, which held that in the absence of physical abuse, neither intemperance nor cruelty had been demonstrated.

Intemperance has also been interpreted to apply to driving while intoxicated. In *Altemus v. Unemployment Compensation Board of Review,* 681 A.2d 866 (Pa. Cmwlth.1996), a teacher who, *inter alia,* had three DUI convictions in seven years, was dismissed by the school district under Section 1122 on grounds of immorality and

---

**20.** In *Gow* this Court agreed that there was substantial evidence in the record to support a finding of intemperance, but it did not identify the acts of cruelty and intemperance. It is, accordingly, of limited utility in this case.

**21.** Moderate is defined as "avoidance of extremes," "showing discretion and self control," "not violent," and "not severe." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1451 (2002). Lack of moderation is engaging in extremes, losing self control, engaging in violent or severe behavior.

**22.** McFerren's conduct at one meeting warranted a reprimand in which Rubano stated that McFerren's behavior was "embarrassing" and suggested that McFerren had an anger management problem. District Exhibit 10. However, the reprimand did not state that McFerren's anger management issue was one that required professional assistance. Rubano acknowledged that where a principal has demonstrated a real deficiency, the district must provide assistance. McFerren's conduct was not so serious as to require his entry into an anger management program. N.T., March 17, 2008, at 199–201.

persistent negligence. He was denied unemployment compensation because his behavior amounted to willful misconduct. In affirming the denial of benefits, this Court determined that although he was not dismissed for intemperance, three incidents of driving under the influence amounted to intemperance because they demonstrated a "loss of control" stemming from a common definition of intemperance, *i.e.*, "[h]abitual . . . use of intoxicating drinks." *Id.* at 870.

There has never been a case where this Court has upheld a dismissal on grounds of intemperance under Section 1122. We decline to do so on the facts found by the Secretary because they do not involve a loss of control that implicates violence, physical contact or drinking to intoxication, but only a raised voice.

### Willful Neglect of Duties

Willful neglect of duties was added to Section 1122 in 1996, and there is little appellate case law explaining its meaning. This Court has defined willful neglect of duties by a professional employee as

an intentional disregard of duties by that employee. . . . [T]here is no requirement of a continuous course of conduct in this charge.

*Williams v. Joint Operating Committee of Clearfield County Vocational–Technical School,* 824 A.2d 1233, 1236 (Pa.Cmwlth. 2003).

In *Williams,* the school's assistant director was found to have willfully neglected his duties when he opened sealed technology bids prior to the noon bid submission deadline and discussed the bid contents with one of the bidders for the project. The director acted in wanton disregard of the pre-established bid specifications and without any authorization.

In *Flickinger v. Lebanon School District,* 898 A.2d 62, 67 (Pa.Cmwlth.2006), this Court found willful neglect where the principal's failure to act placed students in danger. There, a middle school principal did not respond promptly to a report of a gun in the school. The principal knew that he was required to respond immediately to a report of a gun, but he purposely chose not to do so. On these facts, we found willful neglect of duty.

■ Here, the Secretary found that McFerren willfully neglected his duties by changing the school day from seven to eight periods without Board approval; adding integrated math and reading classes without Board approval; failing to keep the District's website updated; and failing to provide enrollment reports to Borkowski in a timely manner. These are a far cry from placing the safety of students in jeopardy or blatantly violating bid procedures, and they do not constitute willful neglect.

First, there is no finding that it was McFerren's duty to get Board approval. It is the superintendent, not the high school principal, who reports to the school board. The record shows that Borkowski was aware of the change to eight periods prior to the beginning of the school year and agreed to the change. It was Borkowski, not McFerren, who should have taken the matter to the Board.[23] Moreover, even if getting Board approval was part of McFerren's duties, there was no evidence

---

**23.** As far as integrated reading and math, McFerren testified that the classes were really tutoring sessions to help raise test scores, which the District already had in place during mornings prior to 2007–2008. The tutoring sessions were simply worked into the school day and referred to as integrated reading and math so that they would not have a negative connotation. Therefore, the need for School Board approval for those classes appears questionable.

that he knew it was his duty and intentionally refused to comply.

Second, maintaining the website was a separate job for McFerren and not one of his duties as principal. In any case, there is no evidence that McFerren's failure to remove the names of retired teachers from the website was intentional.

Finally, with respect to the student enrollment information, there was no evidence that McFerren's "failure" was purposeful. McFerren testified that he submitted the information to Borkowski on several occasions before she sent her memo of May 29, 2007, but she had rejected each report.[24] Regardless of which account is accurate, the evidence does not show that McFerren acted deliberately to deprive Borkowski of enrollment numbers.

Without findings that McFerren knew what his duties were and willfully failed to perform his duties, the Secretary erred in concluding that McFerren was guilty of willful neglect of his duties.

### Incompetency

The Secretary found that McFerren was insubordinate on various occasions and that insubordination equates with incompetency. McFerren was never charged with incompetency, and the Secretary erred in, *sua sponte,* raising the charge of incompetency long after the conclusion of the hearing.

### Conclusion

The relationship between the District's School Board and McFerren was an un-

happy one. The Board charged McFerren with a laundry list of causes recognized as valid under Section 1122 for dismissal of a professional employee. Each party has a different version of the relevant facts. McFerren claims that he did his job as expected, which did not make him popular. Teachers filed grievances with their union and with individual members of the School Board. One infers that the Board found that McFerren did his job with too heavy a hand. However, the Board had a contractual commitment to McFerren, which included an obligation to work with him to move his performance in the direction it desired. Had the Board done so, as required by its own District Policy 424, McFerren may have become the high school principal that the Board members envisioned. If he did not, then the Board would have been able to make out a case for dismissal prior to the end of the contract.

For the above-stated reasons, the District's evidence did not prove that it had a "valid cause" to discharge McFerren. Accordingly, the Secretary's decision is reversed.[25]

### *ORDER*

AND NOW, this 8th day of April, 2010, the order of the Secretary of Education dated January 23, 2009, in the above captioned matter is hereby REVERSED.

**24.** Borkowski then sent an e-mail on July 17, 2007, stating that the Department informed her that the course enrollment information was late. Despite Borkowski's statement that providing the information was McFerren's responsibility, she is the one the Department contacted seeking the information.

**25.** Based on our disposition of the case, we need not address McFerren's argument that the Secretary erred in his role as fact-finder by capriciously disregarding his evidence, by not making express credibility determinations and by applying different standards to the evidence.