# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Timothy Metz, : 
          Petitioner : 
  : 
       v. : No. 630 C.D. 2017
  : Argued:  December 7, 2017
Bethlehem Area School District, : 
          Respondent : 


BEFORE:    HONORABLE ROBERT SIMPSON, Judge
                HONORABLE ANNE E. COVEY, Judge
                HONORABLE DAN PELLEGRINI, Senior Judge


OPINION BY
SENIOR JUDGE PELLEGRINI          FILED: January 4, 2018


Timothy Metz (Petitioner) petitions for review of the decision of the Office of the Secretary of Education, Commonwealth of Pennsylvania (Secretary) denying his appeal and affirming the Board of School Directors (Board) of the Bethlehem Area School District's (School District) termination of his tenured employment pursuant to Section 1122(a) of the Public School Code of 1949 (School Code).[1]

---

[1] Act of March 10, 1949, P.L. 30, *as amended*, 24 P.S. § 11–1122(a).  Section 1122(a) of the School Code states that a professional employee may only be dismissed for the reasons set forth therein, including "immorality" and "wil[l]ful misconduct."  *See Foderaro v. School District of Philadelphia*, 531 A.2d 570 (Pa. Cmwlth. 1987).

> The only valid causes for termination of a contract heretofore or hereafter entered into with a professional employe shall be **immorality**; incompetency; unsatisfactory teaching performance based on two (2) consecutive ratings of the employe's teaching performance that are to include classroom observations, not less

**(Footnote continued on next page…)**

**I.**

Petitioner has been employed with the School District since 2004, and at the time of his discharge, worked at East Hills Middle School (East Hills) as a physical education teacher. He is tenured and a member of the teacher's union, Bethlehem Education Association (BEA). On February 4, 2016, the School District received a copy of a letter dated January 27, 2016, which was addressed to Petitioner's counsel in a custody dispute and sent by opposing counsel, stating in pertinent part:

> acknowledg[ing] receipt . . . of the Drug Test Results from Any Lab Test Now, which indicate a positive result for Cocaine Metabolites. We also received a copy of a Prescription from [Petitioner's] Physician indicating that

---

**(continued…)**

> than four (4) months apart, in which the employe's teaching performance is rated as unsatisfactory; intemperance; cruelty; persistent negligence in the performance of duties; **wil[l]ful neglect of duties**; physical or mental disability as documented by competent medical evidence, which after reasonable accommodation of such disability as required by law substantially interferes with the employe's ability to perform the essential functions of his employment; advocation of or participating in un-American or subversive doctrines; conviction of a felony or acceptance of a guilty plea or nolo contendere therefor; persistent and wil[l]ful violation of or failure to comply with school laws of this Commonwealth (including official directives and established policy of the board of directors); on the part of the professional employe . . . .

24 P.S. § 11–1122(a) (emphasis added). "It is thus apparent that the legislature intended to protect tenure except for the serious charges listed." *Lauer v. Millville Area School District*, 657 A.2d 119, 121 (Pa. Cmwlth. 1995).

> he takes prescription medication which could produce a false positive result for Marijuana.
>
> However, I note that under the Interim Order of December 31, 2015, [Petitioner] is to undergo random drug screening through SASY [Substance Abuse Screening Services, Inc.] for a period of eight (8) weeks. We have received no confirmation that [Petitioner] has complied with this provision of this Order.

(Reproduced Record (R.R.) at 152a.) As a result, Russell Giordano (Director Giordano), the School District's Human Resources Director, immediately went to East Hills and met with Petitioner as well as his union representative. During that meeting, Director Giordano asked Petitioner to submit to a drug test and informed him that if he did not, he would be placing his job in jeopardy.

Because Petitioner refused to submit to that drug test, Director Giordano placed him on unpaid suspension. The same day, Petitioner's counsel sent a letter to the School District, providing "documentation of [Petitioner] as to his prescription medication illustrating a 'false positive result' on a drug screen." (R.R. at 153a.)

By letter dated February 8, 2016, Petitioner was again directed to submit to a drug test. That letter provides, in relevant part:

> This directive is pursuant to 24 P.S. [§] 14-1418(c)[2] and based upon reasonable suspicion of [Petitioner's] drug

---

[2] Section 1418(c) of the School Code provides that: "School boards may require a special medical examination for any school employe at any time." 24 P.S. § 14-1418.

use in violation of School District Board Policy 451[3] and the Pennsylvania School Code. The

---

[3] The School District's Policy 451, "Drug and Substance Abuse" provides, in pertinent part:

**Purpose**

The Board recognizes that the misuse of drugs is a serious problem with legal, physical and social implications for the whole school community and is concerned about the problems that may be caused by employees, especially as the use relates to an employee's safety, efficiency and productivity.

The primary purpose and justification for any district action will be for the protection of the health, safety and welfare of students, staff and school property.

\* \* \*

**Authority**

The Board requires that each professional employee be given notification that, as a condition of employment, the employee will abide by the terms of this policy and notify the district of any criminal drug statute conviction for a violation occurring in the workplace no later than five (5) days after such conviction.

An employee convicted of delivery of or possession of a controlled substance with the intent to deliver shall be terminated from his/her employment with the district.

**Delegation of Responsibility**

A statement notifying employees that the unlawful manufacture, distribution, dispensing, possession, or use of a controlled substance is prohibited in the employee's workplace shall be provided by the Superintendent and shall specify the actions that will be taken against the employee for violation of this policy, up to and including termination, and referral for prosecution.

\* \* \*

The district shall be responsible for taking action within thirty (30) days of receiving notice, with respect to any convicted employee.

**(Footnote continued on next page…)**

4

Administration's reasonable suspicion is based upon information disclosing that [Petitioner] recently tested positive for cocaine metabolites. He has submitted a physician's note indicating that he is prescribed medication that could result in a false positive result for THC; but the note did *not* indicate the potential to test positive for cocaine metabolites. Moreover, School District's third party testing administrators provide the opportunity for a confirmation test if there is a false positive.

If the test is satisfactory, [Petitioner] can meet with the HR Director (Mr. Giordano), to arrange a return to work. If he does not comply with the aforementioned directive, the Administration will recommend his termination from employment based upon failure to comply with Administrative directives; violation of the Pennsylvania School Code; School District Policy, and willful neglect of duties.

(R.R. at 156a) (footnotes added). On February 9, 2016, five days after refusing the first drug test, Petitioner submitted to a urinalysis drug test.

Consistent with the custody dispute letter, Petitioner tested positive for cocaine metabolites. (*See* R.R. at 163a.)

---

**(continued…)**

The district shall take appropriate personnel action against such an employee, up to and including termination, and may require the employee to participate satisfactorily in a drug abuse assistance or rehabilitation program approved for such purposes by a federal, state or local health, law enforcement, or other appropriate agency.

(R.R. at 172a-173a.)

The next day, Dr. Joseph J. Roy (Superintendent Roy), the School District's Superintendent, sent Petitioner a *Loudermill* notice[4] stating that he would be discharged because he "exhibited willful neglect of duties and immoral conduct in violation of . . . School District Policy 451 and the Pennsylvania School Code 24 [§] P.S. 11-1122" because he refused to take a drug test and then tested positive for cocaine metabolites on a subsequent test. (R.R. at 158a.) Petitioner voluntarily waived that hearing.

Then, on March 7, 2016, the School District sent Petitioner a Statement of Charges and Notice of Hearing, notifying him that it was recommending his dismissal from employment and that he was being charged with willful neglect of duties and immorality in violation of the Pennsylvania School Code and School District Policy 451. (*See* R.R. at 166a-167a.) Following a continuance, a hearing was held before the Board on April 28, 2016.

---

[4] Pursuant to the Supreme Court of the United States' decision in *Cleveland Board of Education v. Loudermill*, 470 U.S. 532 (1985):

> The essential requirements of due process . . . are notice and an opportunity to respond. The opportunity to present reasons, either in person or in writing, why proposed action should not be taken is a fundamental due process requirement. The tenured public employee is entitled to oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story. To require more than this prior to termination would intrude to an unwarranted extent on the government's interest in quickly removing an unsatisfactory employee.

*Id*. at 546 (citations omitted).

## II.

Before the Board, Director Giordano testified that on February 4, 2016, he received a call from the Superintendent's Office informing him of a letter between two attorneys in Petitioner's custody dispute acknowledging receipt of Petitioner's positive drug test result for cocaine metabolites. Based upon that letter, Director Giordano stated that he went immediately to East Hills to meet with Petitioner because "anytime that we receive information that a faculty member is potentially under the influence of an illegal substance, we have an obligation to react to that and investigate that." (R.R. at 33a.)

Director Giordano testified that he then held a meeting with Petitioner and the president of the BEA, Jolene Vitalos, as well as the principal of East Hills. He explained that during that meeting, Petitioner "wouldn't look at me. Wouldn't shake hands with me. Was pretty hostile." (R.R. at 35a.)

> He was slouching in his chair and you know, twisting back and forth in his chair, obviously upset. And I told him that we were in receipt of information that would require us to ask him to go for a drug screen that day.
>
> He simply shook his head no. And again, wasn't looking at me. Simply shaking his head no. And then I informed him that by not agreeing to go for the test, he would be placing his job in jeopardy and that I would have no choice but to put him on unpaid suspension immediately.
>
> Mrs. Vitalis [*sic*] then said we will not be going for a drug test. And she informed me that they would grieve the suspension.

7

(R.R. at 35a.) Director Giordano also talked to Petitioner about the Employee Assistance Program, which is for School District employees who have problems with drugs and alcohol, and offered him a brochure. However, Petitioner "tossed the brochure back at [Giordano] across the table, obviously not interested." (R.R. at 36a.) Petitioner was then placed on unpaid suspension.

Five days later, Petitioner submitted to a urinalysis drug test following a second request by the School District. After that test came back positive for cocaine metabolites, the School District issued a Statement of Charges and Notice of Hearing. Director Giordano recommended Petitioner's discharge for two reasons:

> Well, number one, I think that the standards of the district and the standards of the community are pretty clear. And I can't imagine parents being supportive of having faculty members who have been tested positive for an illegal substance.
>
> Number two, one of the things I remember [Petitioner] talking about in the meeting, one of the few things he said in that meeting with me -- and I can't remember exactly. **But the sense was, "what's the big deal? A lot of people do that."**
>
> And I remember saying to him, well, if a lot of people are doing it, you give me some names. And I will make sure that I investigate that.
>
> So I didn't sense any -- anything from him that told me he thought this was wrong. So if you've committed a crime and you don't even think it's wrong, how am I supposed to feel good about that, in terms of a teacher?

(R.R. at 42a-43a) (emphasis added).

Director Giordano testified that, to his knowledge, Petitioner has never been arrested for or charged with a drug offense. When he met with Petitioner on February 4, 2016, he did not observe Petitioner stumbling and "to the extent that he was speaking, I suppose he was coherent. I didn't get much out of him." (R.R. at 56a-57a.) As to why Director Giordano required a urinalysis drug test, he explained:

> I guess what I want to say is, that school districts have an obligation to the parents who send their children to us every day, to make certain that there is a fully functioning, certified, competent teacher in every class, every day.
>
> People who are on drugs are likely not fully functioning every day. We have an obligation to investigate when evidence comes to us, that says we may have a problem; hence, the drug test.

(R.R. at 64a.)

The School District then presented Dr. Rosemary Szollas (Dr. Szollas), a physician and certified medical review officer, who testified that she reviewed Petitioner's February 9, 2016 drug test and it indicated a quantitative value of 537 nanograms of a biological metabolite of cocaine. Dr. Szollas explained that 537 nanograms is "[d]efinitely high, . . . above the cutoff, which would indicate use of the substance or some fashion, the substance was in the individual or the living being." (R.R. at 72a.) She further testified:

9

> I can state with medical certainty, that I have a positive cocaine result in front of me. I can state with medical certainty, based on scientific literature. That **chronic use of cocaine would be probably present within four to five days in urine after use and with a one time use probably within two to three days after use.**

(R.R. at 74a) (emphasis added).

To demonstrate that Petitioner's conduct was immoral,[5] the School District also presented Superintendent Roy, who testified that he has been the Superintendent of the School District for approximately five-and-a-half years and during that time he has resided in Bethlehem City. He previously served as the Assistant Principal in the School District's Liberty High School from 1992-1995. Due to his employment and residency in the School District, he testified that he has a good sense of the community morals. He explained, "I think that a teacher who

---

[5] Under Section 1122 of the School Code, conduct constituting "immorality" is cause for termination of a tenured professional employee. 24 P.S. § 11–1122. While not defined in the School Code, Pennsylvania courts have defined immorality as "conduct that 'offends the morals of the community and is a bad example to the youth whose ideals a teacher is supposed to foster and to elevate.'" *McFerren v. Farrell Area School District*, 993 A.2d 344, 353 (Pa. Cmwlth. 2010) (quoting *Horosko v. School District of Mt. Pleasant Township*, 6 A.2d 866, 868 (Pa. 1939)).

> To establish immorality, a school district must prove three elements: (1) that the alleged immoral act actually occurred; (2) that the act offends the morals of the community; and (3) that the act sets a bad example for students. The moral standards of the community will not be presumed; they must be proved by substantial evidence. Immoral conduct is something more serious than unprofessional conduct.

*McFerren*, 993 A.2d at 354.

10

has tested positive for cocaine is a clear contradiction to the expectations of the community." (R.R. at 84a.) He further explained:

> I think that, you know, we had reasonable suspicion. We required the drug test. The test came back positive. The fact that a teacher who, again, has public trust to teach our community's children, tested positive for the use of cocaine was enough of a violation to meet the immorality clause.
>
> * * *
>
> So I think the context that I'm trying to provide is that we had the positive drug test. But the context of that was either the employee had enough cocaine built up in his system that he was still positive five days after he was directed to take the test, or, after he was confronted by his employer. And then still -- and then tested positive.
>
> So either way, the test, in my opinion, resulted in these charges of immorality.

(R.R. at 85a-86a.)

Following the presentation of the School District's case-in-chief, Petitioner testified on his own behalf. He stated that he has never consumed alcohol or any illegal drugs at work, never came to work impaired, and has never been convicted of any drug-related offense. Petitioner testified that he was never notified that he could be subjected to any type of drug testing while he was at work under the collective bargaining agreement or the School District's policy.

11

Petitioner explained that he refused the first drug test upon his union representative's instruction and because "I felt that it was not needed." (R.R. at 106a.) Then, prior to the second drug test request but after the first request, he admitted to taking cocaine at a Super Bowl party on February 7, 2016.[6] Notwithstanding testing positive for cocaine use on at least two separate occasions, Petitioner denied being a chronic cocaine user. In support of that assertion, he provided ten drug screenings administered between February 11, 2016, and April 20, 2016, as part of his custody dispute, for which he tested negative for cocaine metabolites. He admitted, however, that in addition to the February 9, 2016 drug test, he tested positive for cocaine metabolites for a drug test administrated on December 31, 2016. He also admitted that he would teach his own students that cocaine is "a dangerous drug that should not be used." (R.R. at 116a.)

On May 17, 2016, the Board issued an Administrative Recommendation that Petitioner be terminated from his employment with the School District effective immediately, and Petitioner appealed. Following briefing and argument, on April 21, 2017, the Secretary issued an order dismissing Petitioner's appeal and affirming the School District's decision to terminate his employment because he engaged in conduct constituting immorality by ingesting cocaine, and because his refusal to submit to the February 4, 2016 drug test constituted willful neglect of duty. Petitioner then filed this petition for review.[7]

---

[6] Petitioner testified that the party was on February 6, 2016; however, we take judicial notice that February 6, 2016, fell on a Saturday.

[7] "This Court's standard of review of a decision of the Secretary of Education is limited to [the] determination of whether substantial evidence supports necessary factual findings, and **(Footnote continued on next page…)**

## III.

On appeal, Petitioner contends that the School District did not carry its burden of proof in establishing that he engaged in immorality because the only evidence the School District presented supporting that charge – the February 9, 2016 urinalysis drug test – was obtained unconstitutionally since it lacked reasonable suspicion to order such a test.

## A.

Article 1, Section 8 of the Pennsylvania Constitution provides:

> The people shall be secure in their persons, houses, papers and possessions from unreasonable searches and seizures, and no warrant to search any place or to seize any person or things shall issue without describing them as nearly as may be, nor without probable cause, supported by oath or affirmation subscribed to by the affiant.

Pa. Const. art. 1, § 8. "Although Article [1], Section 8 of the Pennsylvania Constitution is similar in phraseology to that of the Fourth Amendment of the United States Constitution,[8] . . . [it] often provides greater protection since the core of its exclusionary rule is grounded in the protection of privacy while the

---

**(continued…)**

whether an error of law or constitutional violation was committed." *Curl v. Solanco School District*, 936 A.2d 183, 185 n.1 (Pa. Cmwlth. 2007).

[8] The Fourth Amendment of the United States Constitution guarantees "[t]he right of the people to be secure in their persons . . . against **unreasonable** searches and seizures." U.S. Const. amend. IV (emphasis added).

federal exclusionary rule is grounded in deterring police misconduct." *Commonwealth v. Williams*, 692 A.2d 1031, 1038 (Pa. 1997) (footnote added).

A government employer's – here, a public school's – collection and testing of urine constitutes a "search" for purposes of the Fourth Amendment and Article 1, Section 8 of the Pennsylvania Constitution. *See Skinner v. Railway Labor Executives' Association*, 489 U.S. 602, 616-17 (1989) (holding collection and analysis of urine samples constitutes a Fourth Amendment search).

Ordinarily, for a search by the government to be considered constitutionally "reasonable" it must be undertaken by warrant demonstrating probable cause. *See Skinner*, 489 U.S. at 619. "However, 'probable cause' is not an irreducible requirement of a valid search. . . . Where a careful balancing of governmental and private interests suggests that the public interest is best served by a Fourth Amendment standard of reasonableness that stops short of probable cause, we have not hesitated to adopt such a standard." *New Jersey v. T.L.O.*, 469 U.S. 325, 340-41 (1985). This principle applies equally to government employers who have a paramount interest in assuring that employees in safety-sensitive jobs are free from the effects of drugs while performing their duties and whose employees have a lower expectation of privacy with regard to intoxication. *See Skinner*, 489 U.S. at 633-34 (upholding blood and urinalysis drug screening of railway employees involved in train accidents); *National Treasury Employees v. Von Raab*, 489 U.S. 656 (1989) (upholding urinalysis drug tests for United States Customs Service employees seeking transfer or promotion to certain positions); *Copeland v. Philadelphia Police Department*, 840 F.2d 1139 (3d Cir. 1988)

14

(upholding the compulsory urinalysis of a police officer suspected of using illegal drugs); *Majewski v. Fischi*, 372 Fed. App'x 300 (3d Cir. 2010) (upholding breathalyzer test of corrections officer based on particularized suspicion).

The parties do not dispute, and we agree, that public school teachers – like railroad workers, corrections officers and police officers – also hold safety-sensitive jobs and, accordingly, can be compelled to submit to drug testing based on reasonable suspicion. *See Donegan v. Livingston*, 877 F. Supp. 2d 212, 221 (M.D. Pa. 2012), *aff'd*, 523 Fed. App'x 195 (3d Cir. 2013) ("Thus, on the balance, this sort of warrantless Breathalyzer testing of school employees based on reasonable suspicion is reasonable under the Fourth Amendment.").

**B.**

Reasonable suspicion "is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence[,]" yet still requires "more than an inchoate and unparticularized suspicion or 'hunch' of criminal activity." *Illinois v. Wardlow*, 528 U.S. 119, 123-24 (2000) (citations and quotations omitted). Like the probable-cause standard, "the totality of the circumstances – the whole picture – must be taken into account." *United States v. Cortez*, 449 U.S. 411, 417 (1981). Where, as here, a search is based upon information obtained from an informant, courts look to three factors: the informant's veracity, the reliability of the information, and the basis of knowledge. *Commonwealth v. Allen*, 725 A.2d 737, 740 (Pa. 1999).

15

In this matter, there was obviously reasonable suspicion to compel a urinalysis drug test. First, the School District received a letter dated a week prior which was not by an anonymous informant but correspondence between two identified attorneys in a custody proceeding. The fact that the parties were identified must be given significance as counsel's identity exposes him to risks of professional and legal reprisal. *See Commonwealth v. Jackson*, 698 A.2d 571, 574 (Pa. 1997) (noting "a known informant places himself or herself at risk of prosecution for filing a false claim if the tip is untrue, whereas an unknown informant faces no such risk").

Second, the information contained in that letter appears reliable, as it was highly specific and corroborated by additional information. *See, e.g.*, *Commonwealth v. Barber*, 889 A.2d 587, 595 (Pa. Super. 2005) (holding a tipster's information was "sufficiently specific and reliable" to provide reasonable suspicion for a traffic stop where the informant provided a "specific description of the vehicle, driver, and activity at issue"). Here, the letter describes the date of the court order, what it pertained to, Petitioner's drug test results, and that he may have falsely tested positive for marijuana. The fact that the date of the letter and underlying order both occurred in close proximity to the date received, and that the letter conveys the possibility that Petitioner was not complying with an order directing him to undergo further drug tests, lends to the conclusion that Petitioner may have been under the influence of drugs while teaching.

Moreover, subsequent events that took place prior to Petitioner's eventual drug test also corroborated the letter's conveyed information. For

16

instance, prior to requesting the February 9, 2016 drug test, Petitioner's counsel provided documentation confirming that Petitioner was on medication that could cause a false positive drug test result for marijuana use. This information, combined with Petitioner's cavalier attitude at the outset of the February 4, 2016 meeting, corroborated the suspicion that Petitioner did, in fact, use cocaine and may have been under the influence while teaching.

Lastly, the information in the letter was based on personal, first-hand knowledge of Petitioner's drug test, which lends to the conclusion that it should be treated as trustworthy. *See In the Interest of O.A.*, 717 A.2d 490 (Pa. 1998). Specifically, Petitioner's drug test results were not obtained through hearsay, but rather because of a court order issued in a matter involving a custody dispute and provided by opposing counsel.

Accordingly, because there was reasonable suspicion to conduct the urinalysis test and Petitioner does not otherwise challenge the Secretary's determination that his conduct constituted immorality, we affirm the Secretary's order.[9]

_____
DAN PELLEGRINI, Senior Judge

---

[9] Petitioner also contends that the Secretary erred when determining that he engaged in willful neglect of his professional duties. However, because of the manner in which we have resolved this appeal, we do not reach that issue. *See Horton v. Jefferson County-DuBois Area Vocational Technical School*, 630 A.2d 481, 483 (Pa. Cmwlth. 1993) ("This court need only find one of the grounds for the dismissal valid in order to affirm the Secretary's dismissal of Horton's appeal.").

17

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Timothy Metz,                         :
           Petitioner             :
                         :
           v.             : No. 630 C.D. 2017
                         :
Bethlehem Area School District,        :
           Respondent           :

## **O R D E R**

AND NOW, this 4<u>th</u> day of <u>June</u>, 2018, it is hereby ordered that the order of the Office of the Secretary of Education, Commonwealth of Pennsylvania, entered on April 21, 2017, is affirmed.

_____
DAN PELLEGRINI, Senior Judge