**Kenna WILLIAMS, Petitioner,**

v.

**JOINT OPERATING COMMITTEE OF THE CLEARFIELD COUNTY VOCATIONAL–TECHNICAL SCHOOL, Respondent.**

Commonwealth Court of Pennsylvania.

Submitted on Briefs Sept. 27, 2002.

Decided March 18, 2003.

Publication Ordered June 3, 2003.

Toni M. Cherry, DuBois, for petitioner.

Roberta B. Heath, Altoona, for respondent.

Before FRIEDMAN, J., LEADBETTER, J., and MIRARCHI, JR., Senior Judge.

OPINION BY Judge LEADBETTER.

Kenna Williams petitions this court for review of an order of the Secretary of Education affirming the decision of the Joint Operating Committee (JOC) of the Clearfield County Vocational–Technical School .(CCVTS) to dismiss him from employment. Williams, a professional employee, was fired due to his improper handling of the bidding process for updated technology at CCVTS.

The following statement of facts is derived from the Secretary's findings. Williams was employed by CCVTS for about thirty years, the last eight or nine as the Assistant Director of the school. In this capacity, he oversaw the school's plan to update its technology and it was his job to ensure that advertisement, specifications, and review of the computer bids were performed correctly. He had previously been involved in bidding matters while serving in other roles and, before the current matter, his handling of bids had never been criticized at CCVTS.

In the instant case, the bids were due at noon on May 13, 1998. Lisa Ward Craig, president and owner of The Boss's Office, Inc., submitted a bid for the work and met with Williams in his office at about 10:00 a.m. that morning. Although Craig's original bid indicated that she would supply Pentium II computers, which accorded with the bid specifications, she verbally afforded Williams the opportunity to buy Pentium MMX computers. Williams then made notations on Craig's bid that the MMX computers were $150.00 less per computer.

During the time that she was in Williams's office, Craig saw him open another bid, which he discussed with her. Terry Horton, the school's Executive Director, and Eileen Pisaneschi, the JOC Secretary, testified that, as far as they knew, no bid had ever been opened before the bid submission deadline since doing so was not legal.

The JOC met on May 14, 1998; Williams reviewed bid specifications and explained the bid summaries and recommended The

Boss's Office, Inc. as the lowest bidder. Although the JOC could have reviewed the bid submissions on May 14th, it did not. The JOC approved the bid for the Pentium II computers as they were the most up-to-date at that point in time. The bid was granted to The Boss's Office, Inc. and the staff was trained on the computers in August of 1998. It then came to light that the computers that were purchased did not conform to the bid specifications. The JOC had not been specifically informed of the problems with Craig's bid. On September 9, 1998, Craig told Horton that Williams had altered the bid to accept Pentium MMX computers. Later, Williams explained that he did not know if the MMX came standard on the Pentium II computers. After CCVTS found out that the computers were nonconforming, it hired Craig to upgrade ten of them for $425.00 each. Horton explained that the operating committee would have to pay several thousand dollars in order to upgrade all of the computers.

Due to his actions, Williams received from CCVTS a Statement of Charges and Notice of Right to a Hearing. Williams was charged with incompetency, immorality, willful neglect of duties, and persistent and willful violation of or failure to comply with school laws.[1] After eight hearings, the JOC decided to terminate Williams's employment based upon all of the charges except incompetency. *See* JOC op. dated November 23, 1999 at 10. He then appealed the JOC's decision to the Secretary of Education. A "hearing" before the Attorney Examiner, consisting of oral argument, was held on January 21, 2000. (Secretary of Education's Opinion, at 1–5). On January 3, 2002, the Secretary affirmed the JOC's determination, making his own findings of fact.[2]

Williams now appeals to this court,[3] arguing that there was not substantial evidence to support his dismissal on grounds of (1) willful neglect of duties, (2) persistent and willful violation of school laws, and (3) immorality. He also argues that the delay of almost two years between his hearing before the Secretary of Education's hearing officer and the date of the Secretary's decision violated his fundamental right to due process of law. Consequently, he asks for delay damages, legal interest, and an award of counsel fees under Pennsylvania Rule of Appellate Procedure 2744.[4]

Section 1122(a) of the Public School Code of 1949 (Code), Act of March 10, 1949, P.L. 30, *as amended,* 24 P.S. § 11–1122(a), which relates to causes for the termination of a contract, provides in pertinent part:

---

1. This statement of charges specifically provided:

    The charges are based on, but not limited to, the following: procedures used in opening the Link–to–Learn bids; deviations from the bid specifications without appropriate approval; failing to notify or inform the Executive Director or Joint Operating Committee of the deviation from or noncompliance with preestablished bid specifications.

    Certified Record, Exhibit C–21, School District Folder # 3.

2. On appeal, the Secretary is vested with *de novo* review whether he takes additional testimony or simply reviews the record created before the school board. *Forest Area Sch. Dist. v. Shoup,* 153 Pa.Cmwlth. 423, 621 A.2d 1121, 1124–5 (1993).

3. Our scope of review in this case is limited to whether the Secretary's findings of fact are supported by substantial evidence or whether Williams's constitutional rights were violated. *See Zelno v. Lincoln Intermediate Unit No. 12 Bd. of Dir.,* 786 A.2d 1022 (Pa.Cmwlth.2001), *petition for allowance of appeal den.,* 569 Pa. 713, 805 A.2d 528 (2002); *see also Kinniry v. Abington Sch. Dist.,* 673 A.2d 429 (Pa. Cmwlth.1996).

4. Pa. R.A.P. 2744 relates to further costs, counsel fees, and damages for delay.

The only valid causes for termination of a contract heretofore or hereafter entered into with a professional employe shall be *immorality;* incompetency; unsatisfactory teaching performance ...; intemperance; cruelty; persistent negligence in the performance of duties; *wilful neglect of duties;* physical or mental disability as documented by competent medical evidence ...; advocation of or participating in un-American or subversive doctrines; conviction of a felony or acceptance of a guilty plea or nolo contendere therefor; *persistent and wilful violation of or failure to comply with school laws of this Commonwealth* (including official directives and established policy of the board of directors); on the part of the professional employe....

(Emphasis added.) As both parties acknowledge, if this court finds just one of the bases for Williams's discharge valid, we can affirm the Secretary's dismissal of his appeal. *Horton v. Jefferson County–Dubois Area Vocational Technical Sch.,* 157 Pa.Cmwlth. 424, 630 A.2d 481, 483 (1993).

The charge of willful neglect of duties as a valid cause for termination of a professional employee's contract was added by the 1996 amendment to Section 1122 of the Code. While there is a dearth of appellate case law interpreting this violation, the nature of this conduct is easily understood. In the context of a charge of persistent and willful violation of school laws, for example, this court has already explained that, pursuant to Section 1122, a *willful* violation requires "the 'presence of intention, and at least some power of choice.' " *Cowdery v. Bd. of Educ. of the Sch. Dist. of Philadelphia,* 110 Pa.Cmwlth. 164, 531 A.2d 1186, 1188 (1987) (citation omitted). Moreover, "neglect" has been defined as "1: to give little attention or respect to: DISREGARD 2: to leave undone or unattended to esp. through carelessness[.]" MERRIAM–WEBSTER'S COLLEGIATE DICTIONARY 775 (10th ed.2001). Consequently, a willful neglect of duties by a professional employee may also be defined as an intentional disregard of duties by that employee.[5] We note that there is no requirement of a continuous course of conduct in this charge as there is in the charge of persistent and willful violation of school laws.

■ Williams argues that the Secretary improperly determined that he willfully neglected his duties by opening bids before the noon deadline on May 13th because the only record evidence that he did so was based on the insufficient testimony of Lisa Ward Craig.[6] Essentially, Williams main-

---

5. In an informative but clearly different context, our Supreme Court has explained that, under Section 402(e) of the Unemployment Compensation Law, Act of December 5, 1936, Second Ex.Sess., P.L. (1937) 2897, *as amended,* 43 P.S. § 802(e), negligence that is so egregious as to indicate an *intentional disregard* of an employer's interests or an employee's duties (as opposed to mere negligence) rises to the level of willful misconduct. *Navickas v. Unemployment Comp. Review Bd.,* 567 Pa. 298, 306, 787 A.2d 284, 289 (2001).

6. Section 4503(a) of the Antibid–Rigging Act, 62 Pa.C.S. § 4503(a) provides in part: "It is unlawful for any person to conspire, collude or combine with another in order to commit or attempt to commit bid-rigging involving: (1) A contract for the purchase of equipment, goods, services or materials or for construction or repair let or to be let by a government agency." Sections 801 and 807.1 of the Code, 24 P.S. §§ 8–801, 8–807.1, specifically relate to the purchase of supplies for public school use. While Williams·does not raise to this court any issue with respect to whether opening bids before the noon deadline was improper or illegal, the law is clear that " '[t]he requirement in competitive bidding that there be fair and just competition and an absence of favoritism is violated whenever the bidders are treated otherwise than by a common standard.' " *Gaeta v. Ridley Sch. Dist. and IBE Contracting, Inc.,* 567 Pa. 500, 507,

tains that Craig's testimony does not constitute substantial evidence upon which to base his discharge, presumably because she had reason to lie. In this vein, he asserts, *inter alia:* "The testimony of Lisa Ward–Craig, standing alone, cannot rise to the level of being substantial evidence sufficient to support the dismissal of an employee with over 30 years of dedication to his profession, especially when that employee adamantly denies that any such action ever took place." Petitioner's brief at 21.

■ Nonetheless, this court has explained:

> In a case involving the dismissal of a professional employee of a school district, as here, the Secretary is the ultimate factfinder with the power to determine the credibility of witnesses, the weight to be accorded the evidence, and the inferences to be drawn therefrom.
>
> ....
>
> The credibility of witnesses and the weight to be accorded their testimony is within the exclusive province of the Secretary.... The Secretary is not required to make specific findings as to the credibility of each and every witness where the decision itself reflects which witnesses were believed and upon whose testimony the Secretary relied.

*Forest Area Sch. Dist.*, 621 A.2d at 1124 (citations omitted).

Although not explicitly stated, there can be no doubt from the Secretary's determination that he credited the testimony of Craig over that of Williams. Craig testified that she arrived at the school at 10:00 or 10:30 a.m. on May 13th. Notes of Testimony, Hearing of April 21, 1999 at 51, 53. Craig further testified:

Q. What happened when you got here [CCVTS]?

A. I came into the school, greeted Pat, the secretary. Mr. Williams was in the office. I told him that I had the bid and asked him if he got the FAX in the morning. I told him that there was [sic] some other issues that were in there and a lot of documentation in my packet that I had included and if he had questions he could let me know.

....

A. And did Mr. Williams respond to your statements?

Q. Yes, he did. He said oh, this is great. He says, well, we can just go over it now. That was fine with me. I had enough time to go over it. So we proceeded into his office where he opened the bid....

*Id.* at 53–54. Craig further explained that, in the course of their meeting, she offered Williams Pentium MMX microprocessors for $150.00 less per machine even though the "bid specs" called for Pentium II microprocessors and Williams "agreed that that would probably be worth the $150 when the machines were very similar." *Id.* at 56–58, 60.

Moreover, with respect to other bids that were opened in her presence that morning, Craig testified:

A.... He had a bid on his desk that was from, I believe, a lady in like the Butler or Kittanning area, somewhere in eastern (sic) Pennsylvania. He was going over that because of the way they wanted to run their cabling, what kind of cabling they were talking about. While I was in his office, somebody else came, a different vendor came to the school, submitted a bid, handed the bid to Pat,

788 A.2d 363, 367, n. 8. (2002) [citing *American Totalisator Co. v. Seligman,* 34 Pa. Cmwlth. 391, 384 A.2d 242, 258 (1977)]. We reiterate the Secretary's finding, unchal-

lenged by Williams in his brief, that both the school's Executive Director and the JOC Secretary believed it was illegal to open bids before the submission deadline.

the——well, I don't know that they handed it to Pat. Pat had the document in her hand.

Q. You didn't see him hand it——?

A. I did not see him hand it to Pat, no. Pat had it in her hand, Pat brought the documentation in to Mr. Williams. He said, let's see what these guys have to say and proceeded to open theirs.

. . . .

It was in a school report. It was like bound on the side with a clear cover. The back of it was either red or blue. Now, I know the name of that company and I've remembered it and I know it to be Micros and More.

That was the bid that was delivered to his office while I was there which he proceeded to open.

. . . .

Q. He didn't tell you what was in Micros and the one he just received [sic]; did he?

A. He looked through it and had talked about the way they were going to wire. . . .

*Id.* at 88–90. According to Craig, her meeting with Williams lasted "for at least a half hour, probably not an hour in his office." *Id.* at 88.

Clearly, Craig's testimony stands as sufficient evidence to support the Secretary's determination that Williams willfully neglected his duties when he intentionally opened bids and discussed them with Craig in his office before the noon bid submission deadline on May 13th. Moreover, it also stands as substantial evidence that Williams considered altering the bid specifications from the Pentium II computers and that Williams himself agreed to the less expensive, less advanced Pentium MMX microprocessors.[7] That Williams

believes his testimony should have been preferred over Craig's testimony is unavailing where, as here, the Secretary is the ultimate fact-finder and arbiter of credibility. Thus, the termination of Williams's contract as a professional employee based on his willful neglect of duties is supported by the record.

With respect to Williams's contention that his due process rights were violated due to the unreasonable amount of time that it took for the Secretary of Education to render a decision after hearing in this case, we look to this court's previous decision in *Kinniry.* There, Francis Kinniry, a professional employee in the Abington School District who was charged with immorality, argued that a sixteen-month, twenty-day period between the dates of hearing and decision by the Secretary of Education violated his due process rights. We explained, relying on *Ullo v. State Board of Nurse Examiners,* 41 Pa. Cmwlth. 204, 398 A.2d 764 (1979), that "a petitioner seeking to establish that his or her due process rights have been violated bears the burden of proving that some harm or prejudice to his or her interests was caused by the delay." *Kinniry,* 673 A.2d at 433. While, unlike in *Kinniry,* Williams alleges that the prolonged delay in the administrative process resulted in his protracted failure to secure a job as either a teacher or an administrator, this does not constitute evidence that he was harmed by the delay (as opposed to the charges themselves, which were ultimately sustained). Further, Williams does not contend that the delay in any way hampered his ability to defend against the charges facing him. *See Ullo,* 398 A.2d at 766. While we in no way approve of unnecessary delay in the administrative pro-

7. Although, in his testimony, Williams denies opening any bids in Craig's presence, he does not deny discussing the alternative computers with her when she brought in her bid. *See generally* Notes of Testimony, Hearing of October 5, 1999.

cess, it did not amount to a violation of Williams's due process rights.[8]

The order of the Secretary of Education is affirmed.

### ORDER

AND NOW, this 18th day of March, 2003, the order of the Secretary of Education in the above-captioned matter is hereby AFFIRMED.

---

8. We note, however, that Williams did not rush to resolve this matter in our court, where the docket entries reflect that his counsel requested an application for extension of time to file a brief five times.