IN THE COMMONWEALTH COURT OF PENNSYLVANIA

John J. Sweda,                   :
                Petitioner     :
                             :
      v.                     :
                             :
Upper Bucks County Technical    :
School (Department of Education),  :   No. 282 C.D. 2023
                Respondent   :   Argued: April 11, 2024

BEFORE:   HONORABLE ANNE E. COVEY, Judge
              HONORABLE CHRISTINE FIZZANO CANNON, Judge
              HONORABLE BONNIE BRIGANCE LEADBETTER, Senior Judge

<u>OPINION NOT REPORTED</u>

MEMORANDUM OPINION
BY JUDGE FIZZANO CANNON       FILED: May 20, 2024

John J. Sweda (Sweda) petitions for review of the February 28, 2023 decision and order of the Pennsylvania Secretary of Education (Secretary) affirming the dismissal by the Joint Operating Committee (Committee) of Sweda as Executive Director of the Upper Bucks County Technical School (School). Sweda also seeks review of the May 17, 2022 order issued by a hearing officer for the Secretary, which denied Sweda's request to provide additional testimony.[1] Upon review, we affirm.

---

[1] The hearing officer for the Secretary also denied Sweda's request for a pre-hearing conference. Reproduced Record (R.R.) at 978a. Sweda does not challenge this aspect of the order, and the denial of his request to submit additional testimony is addressed *infra* on pages 19 to 20.

We observe that although Sweda failed to identify the May 17, 2022 order by date in his petition for review, his petition nevertheless includes the basis of his objection to the order. *See* Petition for Review at 15, ¶ 123 (asserting that "[he] should have been allowed by the [] Secretary to pursue and make a record on the issue of 'pretext,' the 'real' reason he was fired"); Pa.R.A.P. 1513(d)(4), (5) (providing that "[a]n appellate jurisdiction petition for review shall contain . . . reference to the order or other determination sought to be reviewed, including the date the order

# I. Background

Sweda was employed by the School as a tenured professional employee for approximately three and one-half years, during which he held the title of Executive Director. Secretary's Decision & Order, 2/28/23 (Secretary's Decision), Finding of Fact (F.F.) 1-2. The School is operated by the Committee. F.F. 4. At some point prior to Sweda's dismissal, the School hired William Gerhard (Gerhard) as Building and Grounds Supervisor pursuant to Sweda's recommendation. F.F. 9. Gerhard failed to satisfactorily discharge various aspects of his position, and Sweda repeatedly advised him to remedy his poor job performance. F.F. 22-23. The School proposed demoting and/or suspending Gerhard on the basis of his poor job performance. F.F. 24. The School ultimately issued a notice of intent to dismiss Gerhard for neglect of duty, after Gerhard yelled profanities at Sweda. F.F. 25-26. On November 8, 2021, Gerhard voluntarily quit his employment and submitted a letter of resignation containing allegations against Sweda. F.F. 27 & 161-62. The School placed Sweda on administrative leave the following day. F.F. 5 & 163.

The Committee retained special counsel to perform an independent investigation of the allegations. F.F. 164. On or around December 16, 2021, Sweda received a letter indicating the possibility of disciplinary measures, up to and including discharge. F.F. 170. The letter also stated that Sweda's initial statements during the investigation were "not totally correct," and Sweda conceded that his responses were "occasionally inaccurate." F.F. 171-72. A public statement of

---

or other determination was entered," as well as "a general statement of the objections to the order or other determination"). Further, we note that Sweda reproduced the text of the May 17, 2022 order in the "Orders in Question" section of his appellate brief and attached a copy of the order to the brief. *See* Sweda's Br. at vii; Pa.R.A.P. 2115(a) (stating that "[t]he text of the order or other determination from which an appeal has been taken or which is otherwise sought to be reviewed shall be set forth verbatim immediately following the statement of jurisdiction").

charges was drafted on December 27, 2021, and Sweda was suspended without pay. F.F. 6 & 173-75. On January 3, 2022, the Committee adopted the following charges: incompetency, intemperance, persistent negligence in the performance of duties, willful neglect of duties, and willful failure to comply with school laws (including official directives and established policy of the Committee). F.F. 7; R.R. at 78a (citing Section 1122 of the Pennsylvania Public School Code of 1949 (School Code),[2] 24 P.S. § 11-1122). At a special meeting on January 3, 2022, members of the public commented on Sweda's alleged conduct. F.F. 178. The Committee approved the statement of charges by roll call vote and directed its secretary and president to advise Sweda of his right to a hearing. F.F. 179. Sweda thereafter requested, and received, a private hearing pursuant to Section 1126 of the School Code, 24 P.S. § 11-1126.[3] F.F. 180-81. Testimony offered by both parties over the course of the six-day hearing established the following facts. F.F. 182.[4]

In April 2021, Sweda used the "'F-bomb' a couple of times" in front of students and asked "what the hell's going on?" in the school cafeteria while expressing his displeasure with the state of preparations for a National Technical

---

[2] Act of March 10, 1949, P.L. 30, *as amended*, 24 P.S. §§ 1-101 – 27-2702.

[3] "All hearings, under the provisions of this article or any other provision of the school laws pertaining to the dismissal or the termination of contracts of professional employes, shall be public, unless otherwise requested by the party against whom the complaint is made." Section 1126 of the School Code, 24 P.S. § 11-1126.

[4] Sweda submitted a request for a pre-hearing conference and to provide additional testimony, which a hearing officer for the office of the Secretary denied by order dated May 17, 2022. R.R. at 978a; *see also* Section 1131 of the School Code, 24 P.S. § 11-1131 (providing that "[t]he Secretary . . . shall review the official transcript of the record of the hearing before the board, and may hear and consider such additional testimony as he may deem advisable to enable him to make a proper order").

Honor Society banquet.  F.F. 96, 99, 101-02 & 104.  Sweda was displeased that the tablecloths appeared to be unlaundered and that the arrangement of tables violated restrictions in place at the time due to the COVID-19 pandemic.  F.F. 97-98.  Sweda placed the tablecloths in the wash himself and declared his frustration that he had to do "everybody's f***ing job."  F.F. 101.  The students were surprised by Sweda's outburst and were escorted out of the cafeteria by an administrative assistant.  F.F. 103-04.

Sweda also used profane or abusive language with employees on numerous occasions, including:  talking to the assistant director in a loud and unprofessional voice multiple times while using the "F-bomb," yelling, for example, "what the f*** are you doing," "why do you have a hard-on for the culinary instructor," and "this is your f***ing problem"; repeatedly yelling "f*** you" at the assistant director "on many occasions"; raising his voice with Gerhard at least once per week and using the "F-bomb" during such conversations "from time to time"; calling one employee a "meathead"; and referring to an unidentified individual as a "f***ing lesbian."  *See* F.F. 106-09, 113, 115-16, 119 & 120-23; *see also* Committee Decision at 36.  On another occasion, a small engine instructor stated that he "wasn't feeling the love" from Sweda, intending to reference the perceived toxic work environment.  F.F. 153 & 155.  Sweda responded, "What, do I have to f***ing kiss you to show you the love?"  F.F. 154 (brackets omitted).

Prior to his termination, Sweda disciplined employees for using profane or abusive language, thereby indicating his awareness of Committee policy.  For instance, Sweda supported suspending the purchasing secretary for one day without pay after she slammed her office door and said "f*** you" to her supervisor.  F.F. 157-60; Secretary's Decision at 26; *see also* Committee Decision at 36.

4

Nevertheless, Sweda insisted that as "blue collared guys," it was appropriate for a subordinate employee to yell at him and for Sweda to yell back. F.F.152.

Following the hearing, on or about April 20, 2022, the Committee dismissed Sweda for dishonesty and for the persistent and willful violation of or failure to comply with school laws, including official directives and established policy of the Committee. F.F. 8 & 83. The Committee concluded that Sweda's deliberate violation of policy "over an extended period of time and through multiple incidents" warranted dismissal. Committee Decision at 43. The Committee noted that its "Policy 317"[5] (Policy 317) specifically prohibits the use of profane language and determined that Sweda understood that such language was forbidden at the School. *Id.* Citing the lack of a "clear standard" in caselaw evaluating intemperance under Section 1122 of the School Code, 24 P.S. § 11-1122, the Committee concluded that while Sweda's use of profanity, "particularly in an abusive manner toward [his assistant director]" may have been intemperate, it was more clearly a "persistent" and "willful" violation of Committee policy. *See id.* at 42-43. Further, the

---

[5] Pursuant to Policy 317,

> [w]hen engaged in assigned duties, employees shall not participate in activities that include but are not limited to the following:
>
>> 1. Physical or verbal abuse, or threat of harm, to anyone;
>> . . .
>>
>> 6. Use of profane or abusive language;
>> . . .
>>
>> 10. Violation of [Committee] policies, administrative regulations, rules or procedures;
>> . . . .

R.R. at 613a-14a.

Committee determined that Sweda had willfully neglected his duties. *Id.* The Committee predicated Sweda's violations of Section 1122 of the School Code, 24 P.S. § 11-1122, on his conduct in ignoring the bidding process, misappropriating School property for personal use, directing an employee to turn off a security camera, and his use of profanity, all of which supported his dismissal. *Id.* at 44.[6]

On May 2, 2022, Sweda appealed his dismissal to the Secretary. R.R. at 847a. By letter dated May 13, 2022, Sweda submitted to the Secretary a request to provide additional testimony on several issues, including his assertion of pretext. *Id.* at 929a. Specifically, Sweda requested the opportunity to testify before the Secretary regarding

> the "real reason" he sees the [Committee] has targeted him, his seeking response from the PDE[, presumably referencing the Pennsylvania Department of Education,] on the infirm mask compliance proposal made by prominent [School] board members, including the now current Board Chair, to have parents sign off on masks. The timing of his activity was as school opened in the 2021-2022 school year. He was prevented from testifying on pretext as it allegedly was not relevant to the proceedings. . . . However, it explains the weakness of the charges and the bias of the [Committee] and particularly its Chair.

*Id.* at 929-30a.

---

[6] We agree with the Committee that "Sweda's additional argument that he only cursed in front of 'the guys' was, to be generous, a curious argument. As counsel for the administration pointed out in cross-examination, there is no such exception in Policy 317, nor would the Committee ever endorse such a distinction." Committee Decision at 37. Further, the Committee noted that while it was outside the scope of charges, Sweda's gendered distinction "raise[d] a broader concern under Title IX," presumably referencing Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681-89, asserting that "[i]t is not acceptable for an Executive Director to explicitly impose different standards of behavior for men and women." *Id.* at 37 n.7.

On February 28, 2023, the Secretary affirmed Sweda's dismissal solely on the basis of his use of profane or abusive language.[7]  *See* Secretary's Decision at 20, Conclusion of Law (C.L.) 1-13; *see also id.* at 28.  The Secretary determined that the publication of Sweda's name in connection with the statement of charges in the School's public agenda prior to the private hearing did not violate Sweda's due process rights.  *Id.* at 24-25 (citing *Highlands Sch. Dist. v. Rittmeyer*, 243 A.3d 755 (Pa. Cmwlth. 2020)).  Regarding Sweda's assertion that the disclosure of his identity generated bias, the Secretary emphasized that he conducted a *de novo* review of the record.  *Id.* at 25.

The Secretary deemed Sweda credible "in all respects" regarding his admission to using "profane or abusive language directed to other employees." Secretary's Decision at 25.  The Secretary also found credible employee testimony that Sweda yelled and addressed employees with profane or abusive language by regularly using the "F-bomb," and when he told employees, "What, do I have to f***ing kiss you to show you the love?," "what the f*** are you doing," "this is your f***ing problem," and "f**k you."  *Id.* at 25-26 (brackets omitted).  Further, the Secretary determined that Sweda's prior enforcement of Committee policy against profane or abusive language indicated his awareness of thereof, citing Sweda's decision to warn and, thereafter, to suspend a subordinate employee who

---

[7] Specifically, the Secretary determined that the following alleged actions did not justify dismissal:  (i) Sweda's supervision of and actions in connection with Gerhard; (ii) Sweda's use of the log splitter; (iii) Sweda's use of paver bricks; (iv) Sweda's purported taking of School fuel for personal use; (v) Sweda's use of spray cleaning services; (vi) Sweda's actions regarding the removal and return of a stainless-steel table; (vii) Sweda's mistake in submitting an incorrect grant application; (viii) Sweda's alleged request to turn off a School security camera; (ix) Sweda's alleged relationship with a female employee; (x) Sweda's actions towards the purchasing secretary; and (xi) Sweda's contact with School employees during the pendency of the investigation.  C.L. 1-12.  The Secretary also concluded that the Committee failed to establish dishonesty as an additional basis for Sweda's dismissal.  Secretary's Decision at 26.

told her supervisor, "f*** you,"[8] and Sweda's recommendation for dismissal of another employee who had told Sweda, "f*** you." *Id.* at 26.

Accordingly, the Secretary concluded that a preponderance of the evidence established that Sweda committed the persistent and willful violation of Committee policy "by repeatedly using profane or abusive language in the presence of employees . . . and directed to employees," thereby warranting his dismissal. *Id.* at 26-27. The Secretary, therefore, affirmed the Committee's decision to terminate Sweda's employment as a tenured professional employee pursuant to Section 1122 of the School Code, 24 P.S. § 11-1122. *Id.*

Sweda petitioned this Court for review.

## II. Issues

Before this Court, Sweda argues[9] that the Secretary erred in analyzing his use of profanity as a persistent and willful violation of school laws, rather than as intemperance.[10] *See* Sweda's Br. at 30-31 (citing Section 1122 of the School Code, 24 P.S. § 11-1122). Further, Sweda contends that the instances of profanity in question did not constitute intemperance, which has been defined as "a loss of

---

[8] Notably, in an e-mail to the supervisor recommending suspension without pay of the subordinate employee, Sweda wrote, "I am so sorry you have to go through this. I will back you 100 percent on this. No one should have to deal with this type of behavior." R.R. at 618a.

[9] "This Court must affirm the order of the Secretary unless there was a violation of constitutional rights, an abuse of discretion, an error of law, or if a necessary finding of fact is unsupported by substantial evidence." *Gobla v. Bd. of Sch. Dir. of Crestwood Sch. Dist.*, 414 A.2d 772, 774 (Pa. Cmwlth. 1980).

[10] Sweda asserts that "[w]hile [he] disagrees with the findings, for the purposes of this [a]ppeal, he does not challenge the findings themselves but whether they rise to the level of a Section 1122 termination." Sweda's Br. at 35.

self-control or self-restraint, which may result from excessive conduct." *See id.* at 31 (quoting *McFerren v. Farrell Area Sch. Dist.*, 993 A.2d 344, 360 (Pa. Cmwlth. 2010)). Thus, Sweda maintains that the Secretary erred in affirming his termination, as "[t]here has never been a case where this Court has upheld a dismissal on grounds of intemperance under Section 1122." *Id.* at 32 (quoting *McFerren*, 993 A.2d at 362).

Sweda insists that "the evidence shows that [the School] was never troubled by [his] very rare use of public profanity and the private use of profanity, most of it with male colleagues of executive rank in private, until [the School] wanted to get rid of him," highlighting his "totally clean record" prior to dismissal. Sweda's Br. at 32, 42 & 46 (citing *McFerren*). Sweda maintains that "the incidents of public[11] profanity were only on 2-3 rare occasions" and were not "directed . . . at an individual" and that the remaining instances of profanity occurred in his office. *Id.* at 32-33. Sweda claims that "[o]ther individuals used profanity too." *Id.* at 34. Sweda also asserts that the incident at the honors program banquet occurred months before the renewal of his contract in July 2021. *Id.* at 34. Sweda contends that the investigation "turned [] into a 'get Sweda at all costs' attack and expanded the scope of the investigation to include profanity, the false imputation of an affair, and other alleged issues." *Id.* at 35. Insisting that his "was a pretextual termination that occurred for another reason," Sweda asserts that his use of profanity was merely "one of many convenient non-existent or low-grade offenses [used] to fire [him]." *Id.* at 37.[12] Thus, Sweda maintains that "[p]rofanity [was] a convenient retroactive

---

[11] Sweda presumably references instances of profanity occurring outside his office.

[12] Sweda alleges:

9

gimmick to fire [him] and will be one to fire other administrators and teachers retroactively in the future." *Id.* at 38.[13] Sweda urges this Court to "ardently resist . . . opening the door to drastically lightening the burden for a terminable offense under Section 1122 as presented by an offense of profanity where not even a warning or counseling has occurred, much less [] discipline, particularly where the entity involved subscribed to . . . [p]rogressive [d]iscipline."[14] *Id.* at 37-38.

Moreover, Sweda argues that the conduct in question did not constitute a persistent and willful violation of school law and policy. Sweda's Br. at 38. Sweda posits that while "[p]rofanity[] is, regrettably something that occurs, . . . [s]ocietal norms permit freer use *in private*, among a small coterie of similarly situated workers

Starting in late August[] 2021, and through October[] 2021, [the School] was undergoing a controversy where the [Committee] wanted to go "mask optional" which allowed parents to sign off that masks were medically unnecessary for their children. [Sweda] was not allowed to develop this line of questioning as he wanted to testify that the [Committee's] displeasure at his opposition was the pretextual reason why he was truly being fired. It is currently at issue in [f]ederal [c]ourt litigation, where [Sweda] recently overcame a Motion to Dismiss. *See* Memorandum Opinion, *John Jeffery Sweda v. Upper Bucks County Technical School*, United States District Court for the Eastern District of Pennsylvania, Docket 2:22-cv-1787 (filed August 21, 2023).

Sweda's Br. at 7.

[13] Sweda speculates that "[t]here [is] a subset of [] attorneys in the Commonwealth who specialize in representing [s]chool [d]istricts," and who "constantly advocate for lowering the Section 1122 bar because it is a convenient way to get rid of their client's [sic] employees who are really being fired for other reasons." Sweda's Br. at 48.

[14] Sweda also asserts that "[t]here is no indication in [Policy] 317 what is the penalty for [a] violation [involving profanity]. In the exact same policy, the [Committee] announces a Progressive Disciplinary Policy, with various gradations of penalty, the lightest being reprimand." Sweda's Br. at 11-12 (citing R.R. at 613a-15a).

10

(males versus females), particularly of the same sex." *Id.* at 40. Sweda also "submit[s] that some profanity may be more prevalent in [] trade and vocational school[s] among teachers and administrators" than in "other places." *Id.* Moreover, Sweda emphasizes that "[t]he accusations mainly involve[d] alleged profanity in private, in his office, among two male leaders in the school, his Assistant Superintendent and the School Principal." *Id.*

Sweda cites this Court's statement in *Erdlen v. Lincoln Intermediate Unit No. 12* (Pa. Cmwlth., No, 1435 C.D. 2016, filed July 13, 2017), that "a willful violation of a school law can be summed up as a form of direct defiance of an order[.]" Sweda's Br. at 41 (quoting *Erdlen*, slip op. at 24). Thus, Sweda maintains that he did not willfully defy an order, because he had no knowledge that his conduct was prohibited, asserting that he did not receive even a "'friendly warning' from a Human Resource representative." *Id.* at 41-42. Sweda, therefore, insists that the School should have subjected him to "progressive discipline" in accordance with "Section 300, Code 326"[15] (Policy 326) before terminating his employment. *Id.* at 43 (citing R.R. at 613a-15a). Sweda also asserts that Policy 317 establishes a system of "progressive penalties, including verbal warning, written warning, reprimand, suspension, demotion, or pursuit of civil and criminal sanctions." *Id.* at 45. Sweda explains that "he was not attempting to be insubordinate, but to try to make the school run optimally." *Id.* at 45. Thus, Sweda maintains that "[t]he application of the persistent and willful violation of [s]chool laws formulation seems incredibly harsh here and ignores the obvious factual context of the multiple, diverse, and

---

[15] The record contains the following information pertaining to the cited portion of Committee Policy: Book – Policy Manual, Section 300 – Employees, Title – Complaint Process, Code – 326, Status – Active, Adopted – October, 16, 2018. R.R. at 99a.

11

ramshackle charges the Secretary dismissed as not reaching Section 1122 level." *Id.* at 44.

Next, Sweda argues that the publication of his name in connection with the charges and on the agenda, and the allowance of public comment at the hearing regarding charges, tarnished his right to a private hearing under Section 1126. Sweda's Br. at 48 (citing *Highlands*, 243 A.3d at 763-64). Sweda contends that "no provision of the Sunshine Act[16] mandates that [a school board resolution initiating the disciplinary process] must entail public disclosure of the name of the employee subject to discipline." *Id.* at 50 (quoting *Highlands*, 243 A.3d at 764). Sweda maintains that publishing his name in connection with the charges caused the case to become "sensationalized" and "the talk of [the School] and the Upper Bucks community," thereby "unfairly prejudicing the climate for a decision." *Id.* at 53. Sweda posits that school board bias and pressure from parents and the media is "a well-known phenomenon." *Id.* at 54 n.10. Further, Sweda insists that "[t]he inherent potential bias of School Board members has long been recognized by our courts." *Id.* (citing *Vladimirsky v. School Dist. of Phila.*, 144 A.3d 986, 1001 (Pa. Cmwlth. 2016); *Katruska v. Bethlehem Ctr. Sch. Dist.*, 767 A.2d 1051, 1056 (Pa. 2001); *Harmon v. Mifflin Cnty. School Dist.*, 651 A.2d 681, 686 (Pa. Cmwlth. 1994); *Covert v. Bensalem Twp. School Dist.*, 522 A.2d 129, 131 (Pa. Cmwlth. 1987)). Sweda also asserts that the Secretary "mischaracterized" his "statutory claim of entitlement . . . to a fair hearing" as a due process claim. *Id.* at 52.

Sweda also contends that he "should [have been] allowed to testify and call witnesses on the pretextual or 'real' reason he believes he was fired, which was [his] First Amendment protected public opposition to the anti-mask decisions of the

---

[16] 65 Pa.C.S. §§ 701-716.

12

[Committee]," and that the denial of this opportunity violated his due process rights. Sweda's Br. at 56.[17] Sweda, therefore, requests a remand "with an appropriate legal standard of test to guide the Secretary in addressing issues of low-level violations of policy that appear to be pretextual." *Id.* at 56.

Further, Sweda asserts that the Committee erred in suspending him without pay during the pendency of disciplinary proceedings stemming from charges that were not "serious." Sweda's Br. at 57 (citing *Burger v. Bd. of Sch. Dirs. of McGuffey Sch. Dist.*, 839 A.2d 1055, 1061 (Pa. 2003); *Antonini v. W. Beaver Area Sch. Dist.*, 874 A.2d 679 (Pa. Cmwlth. 2005)). Sweda maintains that "serious misconduct" is "rare" and occurs, for instance, when a teacher engages in a physical altercation with a student. *Id.* at 57-58 (citing *Prieto v. The Sch. Dist. of Phila. (Dep't of Educ.)* (Pa. Cmwlth., No. 144 C.D. 21, filed Dec. 28, 2022)).

Accordingly, Sweda requests reinstatement and the issuance of backpay, benefits and full pension rights. Sweda's Br. at 55. Sweda also requests a declaration of the meaning of a "private hearing" for purposes of Section 1126 of the School Code, 24 P.S. § 11-1126. *Id.* at 55. Additionally, Sweda asks this Court to remand the matter to the Secretary to render further factual findings regarding the "novel" issue of whether the "common human flaw of occasional use of profanity" may constitute the persistent and willful violation of school laws under Section 1122 of the School Code, 24 P.S. § 11-1122. *Id.* at 55-56. As an alternative to reinstatement, Sweda asks this Court to remand the matter for further factual findings and testimony. *Id.* at 58.[18]

---

[17] Sweda claims that he "sought to bring testimony on how his was a pretextual termination that resulted from his C[OVID]-19 activities." Sweda's Br. at 6 (citing R.R. at 929a-31a).

[18] The School also submitted an appellate brief.

13

### III. Discussion

### A. Persistent and Willful Violation of Committee Policy

Sweda asserts that his use of profanity did not constitute a persistent and willful violation of Committee policy. *See* Sweda's Br. at 38-45. We disagree.

"In determining whether a persistent and wil[l]ful violation of school law has occurred, three elements must be examined: persistency, wil[l]fulness and a violation of a school law." *Horton v. Jefferson Cnty.-Dubois Area Vocational Tech. Sch.*, 630 A.2d 481, 484 (Pa. Cmwlth. 1993).

"[P]ersistency is shown where the improper conduct is repeated in a series of separate incidents over a substantial period of time." *McFerren*, 993 A.2d at 357 (citing *Horton*, 630 A.2d at 484). Here, the Secretary deemed credible employee testimony exposing Sweda's regular use of profane or abusive language with numerous subordinates and, on one occasion, in the presence of students.[19] *See* F.F. 96, 99, 101-02, 104, 106-09, 113, 115-16, 119 & 154. Sweda does not challenge these findings. *See* Sweda's Br. at 40. Further, as all of the incidents involved Sweda's use of profane or abusive language with employees and students, they were sufficiently similar for purposes of the "persistency" requirement. *See McFerren*, 993 A.2d at 359 (explaining, "[t]here can be no repetition where the acts or omissions in question are unrelated to one another; the acts in question must be the same or very similar to be persistent"). Thus, Sweda's repeated use of profane or abusive language "over an extended period of time and through multiple incidents" qualifies as persistent for purposes of Section 1122 of the School Code, 24 P.S. § 11-1122. Committee Decision at 43; *see also McFerren*, 993 A.2d at 359 (holding that "[t]he essence of persistency is repetition").

---

[19] We note that Policy 317 "requires employees to maintain professional, moral and ethical relationships with students at all times." R.R. at 613a.

The next element of "[w]il[l]fulness requires the presence of intention and at least some power of choice." *Horton*, 630 A.2d at 484. "For a violation of a school law to be willful, the district must show that the employee knew of the school district's policy in question and deliberately chose not to comply." *McFerren*, 993 A.2d at 357. Here, Sweda's habitual use of profane or abusive language was a matter of voluntary, personal choice. *See Cowdery v. Bd. of Educ. of Sch. Dist. of Phila.*, 531 A.2d 1186, 1188 (Pa. Cmwlth. 1987) (reasoning that "the element of willfulness or intent [for purposes of Section 1122 of the School Code, 24 P.S. § 11-1122,] can often be inferred from the nature and extent of the particular violation").

Nevertheless, Sweda maintains that the absence of any previous disciplinary action against him and his "totally clean record" prior to dismissal preclude finding that he had the requisite knowledge that his language violated Committee policy. *See* Sweda's Br. at 34-34 & 42 (citing *McFerren*). In *McFerren*, we held that a school district failed to prove that a school principal had knowledge of his infractions, and that "[i]n the absence of this knowledge, the [school d]istrict [could not] demonstrate that his conduct constituted willful violation of school law[.]" *McFerren*, 993 A.2d at 359. However, unlike the school principal in *McFerren*, here, Sweda's support for the unpaid suspension of one employee and his recommendation for the dismissal of another on the basis of the employees' use of profanity evidenced his awareness of Committee policy.[20] *See* Secretary's Decision at 26; F.F. 157-60; *see also* Committee Decision at 36. Sweda, therefore,

---

[20] Sweda had used language identical to that which formed the basis of the employees' discipline "on many occasions." *Compare* F.F. 121 *to* Secretary's Decision at 26. Notably, Policy 317 mandates that "[Committee] policies[ and] administrative regulations, rules and procedures" shall be "applied *fairly and consistently*." R.R. at 613a (emphasis added).

15

demonstrated willfulness for purposes of Section 1122 of the School Code, 24 P.S. § 11-1122.

Regarding the third and final element, "violation of a school law, the school district must point to an adopted policy or order that was deliberately violated." *McFerren*, 993 A.2d at 358. Here, the Committee determined that Sweda violated the proscription against "profane or abusive language" contained in Policy 317, and the Secretary affirmed. *See* R.R. at 613a-14a; Committee Decision at 43; Secretary's Decision at 26-28. We agree that Policy 317 clearly prohibits profane and abusive language.

Nevertheless, Sweda insists that "[o]ther individuals used profanity too," that "some profanity may be more prevalent in [] trade and vocational school[s]" than in "other places," and that "[t]he accusations mainly involve[d] alleged profanity in private, in his office, among two male leaders in the school[.]" Sweda's Br. at 32-33 & 40. This reasoning does not negate the fact that the Committee expressly forbids the use of profane or abusive language. *See* R.R. at 613a-14a. As this Court has explained,

> [i]t is clear that such persons (employed or seeking employment in the public schools) have the right under our law to assemble, speak, think and believe as they will. . . . It is equally clear that they have no right to work for the State in the School system on their own terms. . . . If they do not choose to work on such terms, they are at liberty to retain their beliefs and associations and go elsewhere.

*Bovino v. Bd. of Sch. Dirs. of Indiana Area Sch. Dist.*, 377 A.2d 1284, 1289 (Pa. Cmwlth. 1977) (quoting *Adler v. Bd. of Educ. of City of New York*, 342 U.S. 485, 492 (1952)). Thus,

16

> [t]he Legislature can proscribe certain types of behavior [among teachers] which are not conducive to a healthy environment for the students in public school systems. Section 1122 does not infringe on [] the right to free speech in any protected areas. The intendment of this section is not to curtail free speech but to protect an extremely vulnerable and sensitive segment of our society (students).

*Id.* Moreover, Sweda's attempted normalization of profanity does not address the abusive aspect of his violation. *See* Committee Decision at 42 (determining that Sweda directed "abusive profanity" at his assistant director); Secretary's Decision at 26 (concluding that "credible evidence" supported that Sweda "violat[ed] [] [the Committee's] policy against profane *or abusive* language").

We, therefore, agree with the Secretary that Sweda's use of profane or abusive language in violation of Policy 317 constituted the "persistent and wil[l]ful violation of . . . school laws" under Section 1122 of the School Code, 24 P.S. § 11-1122.[21]

---

[21] As Sweda fails to establish that the Secretary erred in affirming his dismissal on the basis that he committed the persistent and willful violation of Committee policy, his insistence that his language did not rise to the level of intemperance is immaterial. *See Williams v. Joint Operating Comm. of Clearfield Cnty. Vocational Tech. Sch.*, 824 A.2d 1233, 1236 (Pa. Cmwlth. 2003) (citing *Horton*, 630 A.2d at 483) (explaining that this Court need address only one basis for termination under Section 1122 of the School Code, 24 P.S. § 11-1122, to affirm the dismissal of a professional employee). We further note that the Committee declined to opine whether Sweda's language rose to the level of intemperance, citing a lack of clarity in applicable caselaw, and the Secretary did not address the issue. *See* Committee Decision at 42; Secretary's Decision at 26-27.

Moreover, in light of our disposition of the present matter, we reject Sweda's request for a remand for further factual findings regarding whether the use of profanity may constitute the persistent and willful violation of school law under Section 1122 of the School Code, 24 P.S. § 11-1122. *See* Sweda's Br. at 55-56.

## B. Progressive Discipline

Sweda maintains the School should have subjected him to "progressive discipline" in accordance with Policies 317 and 326 before instigating dismissal proceedings. Sweda's Br. at 37-38 & 41-43. Policy 317 provides that "[t]he Executive Director[, *i.e.*, Sweda,] or [his] designee shall develop and disseminate disciplinary rules for violations of [Committee] policies, administrative regulations, rules and procedures that provide [for] progressive penalties, including but not limited to verbal warning, written warning, reprimand, suspension, demotion, dismissal, or pursuit of civil and criminal sanctions." R.R. at 614a. Significantly, Sweda does not allege that, as Executive Director, he developed or disseminated any system of "progressive penalties." *Id.* Moreover, Policy 326 does not outline a progressive disciplinary scheme, but rather establishes a process for the filing and resolution of employee complaints. *See* R.R. at 99a-101a (expressing the "[Committee's] intent to establish reasonable and effective means of resolving complaints among employees," and to facilitate "communication between supervisory personnel and employees for situations not covered by the terms of a collective bargaining agreement"). Thus, we disagree that the Committee was obligated to implement progressive discipline prior to Sweda's dismissal.

## C. Due Process

Sweda asserts that the denial of his request to offer evidence of pretext contravened his due process rights. *See* Sweda's Br. at 56. "Demonstrable prejudice is a key factor in assessing whether procedural due process was denied." *D.Z. v. Bethlehem Area Sch. Dist.*, 2 A.3d 712, 721 (Pa. Cmwlth. 2010) (citing *State Dental Council & Examining Bd. v. Pollock,* 318 A.2d 910 (Pa. 1974)); *see also Belle*

*Vernon Area Sch. Dist. v. Gilmer*, 415 A.2d 121, 122 (Pa. Cmwlth.1980) (stating that "[d]ue process guarantees apply to administrative as well as judicial proceedings"). Here, Sweda baldly contends, without further elaboration or supporting legal authority, that his "was a pretextual termination that occurred for another reason," and that his use of profanity was merely "one of many convenient non-existent or low-grade offenses [used] to fire [him]." Sweda's Br. at 37. Sweda's bare assertions fail to demonstrate prejudice, thereby precluding further consideration of Sweda's due process claims. *D.Z.*, 2 A.3d at 733 ("reject[ing] [the petitioner's] bald allegations of error," explaining that "[w]ithout a clear explanation of what testimony [the petitioner] wished to elicit or what evidence she sought to present, and how that evidence may have changed the result, it is impossible to discern any prejudice resulting from the [h]earing [o]fficer's evidentiary rulings").

Further, the sparseness of Sweda's due process claim renders it vulnerable to waiver. *See Commonwealth v. Johnson*, 985 A.2d 915, 924 (Pa. 2009) (citations omitted) ("[W]here an appellate brief fails to provide any discussion of a claim with citation to relevant authority or fails to develop the issue in any other meaningful fashion capable of review, that claim is waived. It is not the obligation of [an appellate court] . . . to formulate [a]ppellant's arguments for him."). Sweda's due process claim predicated on the denial of the opportunity to present evidence of pretext is also waived due to its omission from the "Statement of Questions Involved" portion of his appellate brief. *See* Sweda's Br. at 1-2; Pa.R.A.P. 2116(a) (stating, "[n]o question will be considered unless it is stated in the statement of questions involved or is fairly suggested thereby"); *Twp. of Concord v. Concord Ranch, Inc.,* 664 A.2d 640 (Pa. Cmwlth. 1995) (holding that failure to comply with Pa.R.A.P. 2116(a) results in waiver of the issue). Moreover, although Sweda

contended in the "Summary of Argument" portion of his brief in support of his petition for appeal to the Secretary that "[t]his matter is really about pretextual firing for other protected conduct he did in early-mid September 2021 which [he] seeks to produce evidence on in this proceeding," *see* R.R. at 947a, the remainder of Sweda's brief is devoid of any discussion regarding this assertion, *see* R.R. at 958a-69a, and the Secretary did not address the issue, *see* Secretary's Decision at 1-27.

Moreover, we disagree with Sweda that the Secretary erred in construing as a due process claim his assertion that the disclosure of his name in connection with the statement of charges and the allowance of public comment at the hearing regarding the charges sensationalized proceedings and "unfairly prejudice[ed] the climate for a decision, thereby violating his statutory right to a private hearing. *See* Sweda's Br. at 52-53; *see also Muma v. Pa. Dep't of Health, Div. of Nursing Care Facilities*, 223 A.3d 742, 749-50 (Pa. Cmwlth. 2019 (reasoning that "[a] request for a hearing is a request for an opportunity to be heard, which necessarily implicates due process"); *Gilmer*, 415 A.2d at 122 (agreeing with the trial court that a superintendent's specific allegations of bias against the school board "support[ed] [a] finding of prejudice, or at least an appearance of bias," thereby implicating the superintendent's right to a "due process hearing"). Thus, similar to Sweda's first due process claim, we conclude that Sweda's generalized aspersions regarding Committee bias and pressure from parents and the media fail to demonstrate the requisite prejudice. *See* Sweda's Br. at 53-54 & 54 n.10; *D.Z.*, 2 A.3d at 722 & 733.[22]

---

[22] We acknowledge Sweda's assertion that "[t]he inherent potential bias of School Board members has long been recognized by our courts." Sweda's Br. at 54 n.10 (citing *Vladimirsky v. School Dist. of Phila.*, 144 A.3d 986, 1001 (Pa. Cmwlth. 2016); *Katruska v. Bethlehem Ctr. Sch. Dist.*, 767 A.2d 1051, 1056 (Pa. 2001); *Harmon v. Mifflin Cnty. School Dist.*, 651 A.2d 681, 686

### D. Suspension Without Pay

Sweda contends that he was entitled to pay and benefits during the pendency of the disciplinary proceedings absent a determination that he was faced with "serious charges"; thus, he seeks back-payment of salary and benefits. Sweda's Br. at 57-58 (citing *Burger*; *Antonini*; *Prieto*). Sweda raised this issue on appeal to the Secretary, *see* R.R. at 946a & 956a-57a, but the Secretary did not address it. Nevertheless, as the parties have briefed this purely legal question, in the interest of judicial economy, we will dispose of it now rather than remand to the Secretary. *See Kramer v. Workers' Comp. Appeal Bd. (Rite Aid Corp.)*, 883 A.2d 518, 531 and 531 n.11 (Pa. 2005) (citing *Murphy v. Duquesne Univ. of the Holy Ghost*, 777 A.2d 418, 435 n.12 (Pa. 2001); *Danville Area Sch. Dist. v. Danville Area Educ. Ass'n*, 754 A.2d 1255, 1262 (Pa. 2000); *Pa. Game Com'n v. State Civ. Serv. Comm'n (Toth)*, 747 A.2d 887, 891-92 (Pa. 2000)); *see also Baker v. Moon Area Sch. Dist.*, 2:15-CV-1674, 2018 WL 4627153, at *14 (W.D. Pa. July 2, 2018), *report and recommendation adopted in part, rejected in part*, CV 15-1674, 2018 WL 4057179 (W.D. Pa. Aug. 27, 2018) (stating that "[w]hether the misconduct of which [the employee was] accused constitute[d] "serious misconduct," thereby justifying his suspension without pay prior to the formal hearing required for removal of

---

(Pa. Cmwlth. 1994); *Covert v. Bensalem Twp. School Dist.*, 522 A.2d 129, 131 (Pa. Cmwlth. 1987)). However, Sweda fails to disclose that in each of the cited cases, the Court went on to reject any concerns regarding bias. In *Katruska*, our Supreme Court acknowledged "an inherent potential for bias on the part of school boards" due to "the dual function they serve in acting as both prosecutor and as judge in proceedings involving professional employees," but concluded "that the Secretary['s] *de novo* review of the decision of a school board ensures that the requirements of due process are satisfied." 767 A.2d at 1056; *see also Covert*, 522 A.2d at 131-32 (holding that *de novo* review by the Secretary satisfied any due process concerns resulting from the "inherent potential for bias on the part of school boards"). Similarly, here, in rejecting Sweda's assertion that the disclosure of his identity generated bias, the Secretary emphasized that he conducted a *de novo* review of the record. Secretary's Decision at 25.

superintendents, [was] a question of law for the Court to decide"); *Penn-Delco Sch. Dist. v. Urso*, 382 A.2d 162, 168 (Pa. Cmwlth. 1978) ("consider[ing] a question raised by the [r]espondent," a professional employee of the school district, that "was raised on appeal to the Secretary but was not discussed in the Secretary's opinion," ultimately concluding that the record did not support the respondent's claim).

"Pennsylvania courts have long permitted suspensions pending dismissal for public employees, including teachers." *Slater v. Sch. Dist. of Phila.*, 309 A.3d 1144, 1156 (Pa. Cmwlth. 2024) (quoting *Prieto*, slip op. at 14) (citing *Burger*). In *Burger*, this Court acknowledged the "implied authority [of school boards (in this case, the Committee)] to suspend [] officials accused of serious misconduct, *even without pay and benefits*, within the constraints of procedural due process." 839 A.2d at 1061 (emphasis added). We clarified in *Antonini* that "[i]t is the seriousness of the misconduct alleged that forms the necessity for the implied power." 874 A.2d at 683 (quotation marks omitted). We, therefore, held that "resort to procedures beyond those specified in the School Code is the exception rather than the rule, reserved for allegations of 'serious misconduct.'" *Id.*[23] Thus, whether Sweda is entitled to back-payment of salary and benefits for the period of his unpaid suspension hinges on whether he was charged with serious misconduct. *See id.*

---

[23] We note that *Burger* and *Antonini* involved suspensions of superintendents, who are governed by a separate dismissal provision. *See Burger*, 839 A.2d at 1056; *Antonini*, 874 A.2d at 680; *see also* Section 1080(a) of the School Code, 24 P.S. § 10-1080(a) (providing that "[d]istrict superintendents and assistant district superintendents may be removed from office and have their contracts terminated, after hearing, by a majority vote of the board of school directors of the district, for neglect of duty, incompetency, intemperance, or immorality . . . ."). Nevertheless, we note that the points of law cited above in *Burger* and *Antonini* pertain to "officials" and are not limited to superintendents. *See Burger*, 839 A.2d at 1061; *Antonini*, 874 A.2d at 683. Moreover, this Court has recognized the authority of school boards to suspend school employees other than superintendents, including teachers. *See, e.g.*, *Slater*, 309 A.3d 1144, 1156 (citing *Burger*); *Prieto*, slip op. at 14 (citing *Burger*).

In *Antonini*, we declined to "define the phrase 'serious misconduct'" for purposes of whether a suspension without pay was warranted under *Burger*, reasoning that "[i]t [w]as sufficient for present purposes to contrast the nature of the misconduct alleged in *Burger* with that alleged here." 874 A.2d at 683. Likewise, here, we refrain from offering a blanket definition of the term.

Sweda insists that "serious misconduct" is "rare." Sweda's Br. at 57-58 (citing *Prieto*). In *Prieto*, a teacher was suspended without pay, though with health benefits, and was ultimately dismissed after his loss of self-control in throwing a book at a student and participating in a fistfight in the classroom was found to constitute intemperance under Section 1122 of the School Code, 24 P.S. § 11-1122. *See Prieto*, slip op. at 6-7 & 12. We concluded that the charge of serious misconduct warranted suspension without pay pending dismissal proceedings, emphasizing that "[t]he welfare of the children is the paramount consideration." *Id.*, slip op. at 15 (quoting *Kaplan v. Sch. Dist. of Phila.*, 130 A.2d 672, 676 (Pa. 1957)). Likewise, here, Sweda's habitual use of profane or abusive language constituted serious misconduct by compromising student welfare, whether indirectly by fostering a toxic environment at school or directly through the outburst witnessed by students.[24] Moreover, although Sweda's violations of Committee policy did not involve physical violence, it is vital to emphasize that serious misconduct is not limited to only the most egregious examples. *See Baker*, 2018 WL 4627153, at *14 ("find[ing] that there [was] no suggestion in the *Burger* decision that serious misconduct [was] limited to accusations of sexual misconduct," and determining that the alleged

---

[24] As noted above, the Secretary's factual findings include an employee's statement that Sweda's language created a toxic work environment and recount how an administrative assistant escorted surprised students out of the cafeteria following Sweda's outburst before the honors banquet. *See* F.F. 103-04, 153 & 155.

misconduct against the superintendent, who was suspended without pay pending dismissal proceedings, "raise[d] concerns regarding [his] fiscal accountability and management ability, affecting the public trust," and "should be considered serious").

## IV. Conclusion

For the foregoing reasons, we affirm the February 28, 2023 decision and order of the Secretary.

_____
CHRISTINE FIZZANO CANNON, Judge

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

John J. Sweda,                                 :
                          Petitioner           :
                                               :
              v.                               :
                                               :
Upper Bucks County Technical                   :
School (Department of Education),              :     No. 282 C.D. 2023
                          Respondent           :

# **O R D E R**

AND NOW, this 20th day of May, 2024, the May 17, 2022 and February 28, 2023 orders of the Pennsylvania Secretary of Education are AFFIRMED.

_____
CHRISTINE FIZZANO CANNON, Judge